## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| WCI COMMUNITIES, INC., et al.,[1] | ) | Case No. 08 - 11643 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

---

## DISCLOSURE STATEMENT RELATING TO THE SECOND
## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR WCI COMMUNITIES, INC. AND ITS AFFILIATED DEBTORS

---

Dated: July 16, 2009

WHITE & CASE LLP
Thomas E Lauria
Craig H. Averch
Matthew C. Brown
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

FOX ROTHSCHILD LLP
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
919 Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 654-7444

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

---

[1]      The List of the Debtors and Tax Identification Numbers is located on the docket for Case No. 08-11643
(KJC) [Docket No. 64] and http://chapter11.epiqsystems.com/wcicommunities.

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS ....................................................................................2

III. EXPLANATION OF CHAPTER 11 .......................................................................................4

    A.    Overview of Chapter 11. ........................................................................................4

    B.    Plan of Reorganization. ...........................................................................................5

    C.    Confirmation of a Plan of Reorganization. ..............................................................5

IV. OVERVIEW OF THE PLAN...................................................................................................6

    A.    Summary of the Terms of the Plan. ........................................................................6

    B.    Summary of Distributions Under the Plan...............................................................8

V. GENERAL INFORMATION ...................................................................................................12

    A.    Overview of the Debtors. ......................................................................................13

    B.    Business and Properties of the Debtors. ................................................................14

        1.    Core Business Operations. ........................................................................14

        2.    Debtors' Future Plans for Continuing Business Operations. ....................16

        3.    Employees. ................................................................................................17

        4.    Management. .............................................................................................17

    C.    Prepetition Capital Structure. ................................................................................19

    D.    Events Leading to the Commencement of the Chapter 11 Cases. .........................21

VI. CERTAIN AFFILIATE TRANSACTIONS ...........................................................................23

    A.    Overview. ...............................................................................................................23

    B.    Centralized Cash Management. .............................................................................23

    C.    Corporate Overhead. .............................................................................................24

    D.    Treatment of Intercompany Claims under the Plan. ..............................................24

VII. SELECTED FINANCIAL INFORMATION .........................................................................25

    A.    Annual Financial Information for WCI. ................................................................25

B.    Financial Statements for WCI..................................................................................25

VIII. FINANCIAL PROJECTIONS AND ASSUMPTIONS .......................................................29

A.    Purpose and Objectives.........................................................................................29

B.    Projected Consolidated Financial Statements........................................................29

IX. VALUATION ................................................................................................................30

X. THE REORGANIZATION CASES.....................................................................................31

A.    Commencement of the Chapter 11 Cases. ..............................................................31

B.    Procedural Orders. .................................................................................................31

    1.    Joint Administration......................................................................................31

    2.    Interim Compensation and Reimbursement of Professional Persons
            and Committee Members. .............................................................................31

C.    Continuation of Business After the Petition Date....................................................32

    1.    Cash Collateral.............................................................................................32

    2.    Debtor-in-Possession Financing. ..................................................................33

    3.    Business Operations......................................................................................34

    4.    Employee-Related Matters............................................................................40

D.    Representation of the Debtors.................................................................................40

E.    Formation and Representation of the Creditors' Committee.....................................41

F.    Matters Relating to Unexpired Leases and Executory Contracts. ...........................41

G.    Exclusive Periods...................................................................................................43

H.    Asset Dispositions..................................................................................................43

I.    Key Employee Incentive Plan.................................................................................45

J.    The Automatic Stay. ..............................................................................................45

K.    Alternative Dispute Resolution...............................................................................46

L.    Debtors' Schedules; Bar Date; Claims Objections and Estimated Amount of
        Claims. ..................................................................................................................47

    1.    Debtors' Schedules and Bar Date. ................................................................47

    2.    Claims Objections. .......................................................................................48

        3.      Estimation of Claims..................................................................................48

XI. MATERIAL CLAIMS AND LITIGATION ...........................................................................48

    A.    Safeco Litigation and Settlement. ...........................................................................49

    B.    Chinese Drywall..........................................................................................................49

    C.    Potential Avoidance Action Litigation Against the Prepetition Lenders...............53

XII. THE CHAPTER 11 PLAN...................................................................................................54

    A.    Resolution of Certain Inter-Debtor Issues. ............................................................55

        1.      Intercompany Claims and Equity Interests. ................................................55

        2.      Treatment of Guaranty and Joint Liability Claims Against a Debtor........55

    B.    Classification and Treatment of Claims and Equity Interests.................................55

        1.      Treatment of Unclassified Claims. ...............................................................55

        2.      Treatment of Classified Claims and Equity Interests. ................................57

    C.    Means for Implementation of the Plan......................................................................59

        1.      Organization of New WCI............................................................................59

        2.      Operations Between the Confirmation Date and the Effective Date. ........60

        3.      Implementing Transactions on or Prior to the Effective Date. .................60

        4.      Corporate Action............................................................................................63

        5.      Re-Vesting of Assets.....................................................................................63

        6.      Initial Boards of Directors. ..........................................................................64

        7.      Management Agreement.................................................................................64

        8.      Management and Officers..............................................................................64

        9.      Director and Officer Liability Insurance.....................................................64

        10.     Causes of Action. ..........................................................................................65

        11.     Appointment of the Disbursing Agent.........................................................65

        12.     Sources of Cash for Plan Distributions........................................................65

        13.     Investment of Funds Held by the Disbursing Agent; Tax Reporting
                by the Disbursing Agent. .............................................................................65

| | 14. | New WCI Employee Incentive Programs. | 66 |
|---|---|---|---|
| | 15. | Releases by the Debtors. | 66 |
| | 16. | Releases by Creditors and Equity Security Holders. | 67 |
| D. | | Description of Certain Securities to be Issued Pursuant to the Plan. | 67 |
| | 1. | New WCI Common Stock. | 67 |
| | 2. | New WCI Senior Secured Term Notes. | 68 |
| | 3. | New WCI Senior Secured Subordinated PIK Notes. | 68 |
| | 4. | New WCI Preferred A Stock. | 69 |
| | 5. | New WCI Preferred B Stock. | 70 |
| | 6. | Issuance of the New WCI Securities. | 70 |
| E. | | The Plan Trust. | 71 |
| | 1. | Creation of the Plan Trust and the Appointment of the Plan Trustee. | 71 |
| | 2. | Property of the Plan Trust. | 71 |
| | 3. | Powers and Duties of the Plan Trustee. | 71 |
| F. | | The Creditor Trust. | 72 |
| | 1. | Creation of the Creditor Trust and Appointment of the Creditor Trustee. | 72 |
| | 2. | Property of the Creditor Trust. | 72 |
| | 3. | Purpose of the Creditor Trust. | 72 |
| | 4. | Powers of the Creditor Trustee. | 73 |
| | 5. | Creditor Trust Advisory Board. | 73 |
| | 6. | Cooperation Between Creditor Trustee and Disbursing Agent. | 73 |
| | 7. | Termination of the Creditor Trust. | 73 |
| G. | | The Chinese Drywall Trust. | 74 |
| | 1. | Creation of the Chinese Drywall Trust and Appointment of the Chinese Drywall Trustee. | 74 |
| | 2. | Property of the Chinese Drywall Trust. | 74 |
| | 3. | Purpose of the Chinese Drywall Trust. | 75 |

|   |   | 4. | Powers of the Chinese Drywall Trustee. | 75 |
|   |   | 5. | Chinese Drywall Trust Advisory Board. | 76 |
|   |   | 6. | Cooperation Between Chinese Drywall Trustee and Disbursing Agent. | 76 |
|   |   | 7. | Assumption of Liabilities by the Chinese Drywall Trust. | 77 |
|   |   | 8. | Termination of the Chinese Drywall Trust. | 77 |
| H. |   | Plan Distribution Provisions. | | 78 |
|   |   | 1. | Plan Distributions. | 78 |
|   |   | 2. | Timing of Plan Distributions. | 78 |
|   |   | 3. | Address for Delivery of Plan Distributions/Unclaimed Plan Distributions. | 78 |
|   |   | 4. | De Minimis Plan Distributions. | 78 |
|   |   | 5. | Time Bar to Cash Payments. | 79 |
|   |   | 6. | Manner of Payment under the Plan. | 79 |
|   |   | 7. | Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent. | 79 |
|   |   | 8. | Fractional Plan Distributions. | 79 |
|   |   | 9. | Special Distribution Provisions Concerning the Prepetition Credit Facilities. | 79 |
|   |   | 10. | Special Distribution Provisions Concerning the Prepetition Note Claims. | 80 |
|   |   | 11. | Surrender and Cancellation of Instruments. | 83 |
| I. |   | Procedures for Resolving and Treating Contested Claims. | | 83 |
|   |   | 1. | Continuation of ADR. | 83 |
|   |   | 2. | Objection Deadline. | 83 |
|   |   | 3. | Prosecution of Contested Claims. | 84 |
|   |   | 4. | Claims Settlement. | 84 |
|   |   | 5. | Entitlement to Plan Distributions upon Allowance. | 84 |
|   |   | 6. | Estimation of Claims. | 84 |

| | | | |
|---|---|---|---|
| J. | | Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date. | 85 |
| | 1. | Conditions Precedent to Confirmation. | 85 |
| | 2. | Conditions Precedent to the Occurrence of the Effective Date. | 85 |
| | 3. | Waiver of Conditions. | 86 |
| | 4. | Effect of Non-Occurrence of the Effective Date. | 86 |
| K. | | The Disbursing Agent. | 86 |
| | 1. | Powers and Duties. | 86 |
| | 2. | Plan Distributions. | 86 |
| | 3. | Exculpation. | 86 |
| L. | | Treatment of Executory Contracts and Unexpired Leases. | 87 |
| | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 87 |
| | 2. | Cure. | 89 |
| | 3. | Claims Arising from Rejection, Expiration or Termination. | 89 |
| | 4. | Non-Executory Contracts. | 90 |
| M. | | Retention of Jurisdiction. | 91 |
| N. | | Other Material Provisions of the Plan. | 92 |
| | 1. | Payment of Statutory Fees. | 92 |
| | 2. | Satisfaction of Claims. | 92 |
| | 3. | Special Provisions Regarding Insured Claims. | 93 |
| | 4. | Third Party Agreements; Subordination. | 93 |
| | 5. | Exculpation. | 94 |
| | 6. | Discharge of Liabilities. | 94 |
| | 7. | Discharge of Debtors. | 94 |
| | 8. | Financial Reporting. | 95 |
| | 9. | Governing Law. | 95 |
| | 10. | Exemption From Transfer Taxes. | 96 |

11.  Interest and Attorneys' Fees. ........................................................96

12.  Modification of the Plan. .............................................................96

13.  Consultation and Agreement.........................................................96

14.  Revocation of Plan. ......................................................................97

15.  Setoff Rights. ...............................................................................97

16.  Rates.............................................................................................97

17.  Dissolution of the Creditors' Committee. .....................................98

18.  Injunctions....................................................................................98

19.  Binding Effect. .............................................................................99

20.  Severability. .................................................................................99

21.  No Admissions............................................................................100

22.  Plan Controls..............................................................................100

XIII. RISK FACTORS.................................................................................100

A.  General Considerations. ........................................................................100

B.  Certain Bankruptcy Considerations. .....................................................100

C.  Inherent Uncertainty of Financial Projections. .....................................101

D.  Claims Estimations. ..............................................................................101

XIV. CONFIRMATION AND CONSUMMATION PROCEDURES .........................101

A.  Overview................................................................................................101

B.  Confirmation of the Plan........................................................................103

1.  Elements of Section 1129 of the Bankruptcy Code. ................103

2.  Acceptance.................................................................................104

3.  Best Interests of Creditors Test.................................................105

4.  Feasibility..................................................................................106

C.  Cramdown...............................................................................................106

1.  No Unfair Discrimination. ........................................................106

2.  Fair and Equitable Test. ............................................................107

D.      Effect of Confirmation. ........................................................................107

XV. MANAGEMENT OF NEW WCI ........................................................................108

XVI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ......................108

A.      U.S. Federal Income Tax Consequences to the Debtors........................109

1.      Cancellation of Debt Income. ...................................................110

2.      Accrued Interest. .......................................................................112

3.      Gain or Loss on Sale of Assets. ...............................................112

4.      Utilization of Debtors' Net Operating Loss Carryforwards. ....112

5.      Transfer of Assets to New WCI.................................................114

B.      U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to
         Holders of Allowed Claims. .................................................................115

1.      General Tax Considerations for Holders of Allowed Claims.....115

2.      Certain Other Tax Considerations for Holders of Allowed Claims.........116

3.      Tax Consequences to Certain Holders of Allowed Claims. .....118

C.      U.S. Federal Income Tax Consequences to Holders of Contested Claims..........121

D.      U.S. Federal Income Tax Consequences of Ownership of New WCI
         Common Stock and Notes. ...................................................................121

1.      U.S. Holders..............................................................................121

2.      U.S. Federal Income Tax Consequences of Ownership of New WCI
         Common Stock...........................................................................122

3.      U.S. Federal Income Tax Consequences of Ownership of Notes...........124

E.      Backup Withholding Tax and Information Reporting Requirements.................128

F.      Consequences to Pre-Bankruptcy Holders of Equity Interests. ............128

G.      Tax Classification of New WCI.............................................................128

XVII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN ...............................................................................................................129

A.      Liquidation Under Chapter 7 of the Bankruptcy Code.........................129

B.      Alternative Plans of Reorganization. ...................................................130

XVIII. CONCLUSION ...............................................................................................................131

## <u>SCHEDULES AND EXHIBITS</u>

List of Defined Terms ....................................................................................................Schedule 1

List of the Debtors .........................................................................................................Schedule 2

Schedule of Rejected Executory Contracts and Unexpired Leases ......................................Schedule 3

Schedule of Assumed and Assumed and Assigned Executory Contracts and
    Unexpired Leases......................................................................................................Schedule 4

Schedule of Non-Executory Contracts and Leases ............................................................Schedule 5

Joint Chapter 11 Plan of Reorganization ..........................................................................Exhibit "A"

Disclosure Statement Order .............................................................................................Exhibit "B"

Liquidation Analysis .......................................................................................................Exhibit "C"

Projections ......................................................................................................................Exhibit "D"

Valuation.........................................................................................................................Exhibit "E"

Company Orgizational Charts (as of Petition Date)............................................................Exhibit "F"

# I.

## INTRODUCTION

**All capitalized terms used in the Disclosure Statement and not defined herein shall have the meanings ascribed thereto in the Plan (see Exhibit "A" to the Plan, Glossary of Defined Terms). For ease of reference, all defined terms used in the Disclosure Statement that are not defined in the Plan are listed on Schedule 1 to this Disclosure Statement with reference to the page number where the term is defined. Unless otherwise stated, all references herein to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**

BY ORDER DATED JULY __, 2009 (THE "DISCLOSURE STATEMENT ORDER"), THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") APPROVED THE DISCLOSURE STATEMENT RELATING TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WCI COMMUNITIES, INC. AND ITS AFFILIATED DEBTORS (THE "DISCLOSURE STATEMENT") FILED BY AND WITH RESPECT TO THE CHAPTER 11 DEBTORS LISTED IN SCHEDULE 2 HERETO (THE "DEBTORS").[2] THE DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WCI COMMUNITIES, INC. AND ITS AFFILIATED DEBTORS, DATED JULY __, 2009 (THE "PLAN"), A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A". OTHER THAN (I) CLASS 1 – PRIORITY CLAIMS AND CLASS 8 – OTHER EQUITY INTERESTS, WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND (II) CLASS 7 – WCI EQUITY INTERESTS, WHICH ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE FOREGOING CLASSES OF CLAIMS OR INTERESTS THAT ARE ALREADY DEEMED TO HAVE ACCEPTED OR REJECTED THE PLAN, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM ALL OTHER HOLDERS OF CLAIMS.

THE DEBTORS, THE PREPETITION LENDERS, AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF CLAIMS. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER, A TRUE AND CORRECT COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "B". IN ADDITION, THE SOLICITATION PACKAGE ACCOMPANYING EACH OF THE BALLOTS CONTAINS APPLICABLE VOTING INSTRUCTIONS. **TO BE**

---

[2]    Schedule 2, attached hereto, lists the Debtors whose cases are being jointly administered under Case No. 08-11643. Schedule 2 also includes the tax identification number for each Debtor.

COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND
ACTUALLY RECEIVED BY 4:00 P.M. (PREVAILING EASTERN TIME), ON AUGUST
__, 2009 (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN,
PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF
DISTRIBUTIONS UNDER THE PLAN," BELOW.

II.

**NOTICE TO HOLDERS OF CLAIMS**

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is
impaired under the Plan, to make an informed decision in exercising your right to accept or reject
the Plan.  See "Confirmation and Consummation Procedures."

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION
THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.
PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE
STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE
PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THE EXHIBITS AND
SCHEDULES ANNEXED TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS
CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE
DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS
CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE
HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET
FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN,
THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE
WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES")
AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE
SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE
STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE
SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC
PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS
CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE
PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF WCI
OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS
DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR
WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER
ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL**

**NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, WCI OR ANY OF ITS SUBSIDIARIES AND AFFILIATES.**

On July __, 2009, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order pursuant to section 1125 of the Bankruptcy Code, finding that the Disclosure Statement contains information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement, and if other information is given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses or the Plan other than that contained in this Disclosure Statement and the Schedules and Exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot, and return the same to the address set forth on the ballot, in the enclosed, postage prepaid, return envelope so that it will be actually received by Epiq Bankruptcy Solutions LLC (the "Solicitation Agent" or "Claims Agent," as applicable), no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. **All ballots must be actually received by the Solicitation Agent no later than August __, 2009 at 4:00 p.m., Prevailing Eastern Time. For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B".**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You will be bound by the Plan if it is accepted by the requisite holders of Claims and confirmed by the Bankruptcy Court, even if you do not vote to accept the Plan or if you are the holder of an unimpaired Claim. See "Confirmation and Consummation Procedures."

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on August __, 2009, at _____ __.m., Prevailing Eastern Time, before the Honorable Kevin J. Carey, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before August __, 2009, in the manner described in the Disclosure Statement Order attached hereto as Exhibit "B".**

**THE DEBTORS URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

## III.

## EXPLANATION OF CHAPTER 11

A.    **Overview of Chapter 11.**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code pursuant to which a debtor may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest. The Debtors commenced chapter 11 cases (the "Chapter 11 Cases") with the filing by the Debtors of petitions for voluntary protection under chapter 11 of the Bankruptcy Code on August 4, 2008 (the "Petition Date"). By order of the Bankruptcy Court, the Chapter 11 Cases have been consolidated for administrative purposes and are jointly administered under Case No. 08-11643 (KJC).

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Cases, each Debtor remains in possession of its property and continues to operate its business as a debtor in possession. See "The Reorganization Cases – Continuation of Business after the Petition Date."

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization. In the Chapter 11 Cases, several creditors have obtained relief from the automatic stay, some by consent of the Debtors. See "The Reorganization Cases – The Automatic Stay."

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor's estate. Unless a trustee is appointed, only a debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"), and the debtor will have 180 days to solicit acceptance of such plan (the "Solicitation Period"). However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Filing Period and Solicitation Period upon a showing of "cause." The Filing Period and Solicitation Period may not be extended beyond 18 months and 20 months, respectively, from the Petition Date. As set forth below in "The Reorganization Cases – Exclusivity Periods," the Debtors' Filing Period and Solicitation Period were extended to June 30, 2009 and August 31, 2009, respectively, and the Debtors filed the Plan within the applicable Filing Period. As the Debtors filed the Plan during the Filing Period, no other creditor or party in interest may file a plan until the expiration of the Solicitation Period. See "The Reorganization Cases – Exclusivity Periods."

**B.    Plan of Reorganization.**

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on a debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan," below.

After a plan of reorganization has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare and file a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

**C.    Confirmation of a Plan of Reorganization.**

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "Confirmation and Consummation Procedures – Confirmation of the Plan." **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan for the bankruptcy court to determine that the class has accepted the plan. See "Confirmation and Consummation Procedures."

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively

deemed to have rejected the plan. <u>See</u> "Confirmation and Consummation Procedures." Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. **Except for Class 1 – Priority Claims and Class 8 – Other Equity Interests, which are unimpaired under the Plan, and Class 7 – WCI Equity Interests, which will not receive a distribution under the Plan, all classes of Claims are entitled to vote on the Plan.**

In general, a bankruptcy court also may confirm a plan of reorganization even though fewer than all the classes of impaired claims against and equity interests in a debtor accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. <u>See</u> "Confirmation and Consummation Procedures – Cramdown." **The Plan has been structured so that it will satisfy the foregoing requirements for each of the Debtors as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.**

IV.

<u>OVERVIEW OF THE PLAN</u>

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in Jointly Administered Case Nos. **08-11643 (KJC) through 08-11770 (KJC)**.

A.    **Summary of the Terms of the Plan.**

The Plan is built around the following key elements:

- Except as provided below, the Debtors' businesses will continue to be operated in substantially their current form as of the Effective Date.

- On the Effective Date, New WCI shall issue the following securities:

  o New WCI Common Stock.

  o New WCI Senior Secured Term Notes, which shall be in the aggregate principal amount of $300 million, and which shall be secured by a first priority lien on and security interest in substantially all of the assets of New WCI and its subsidiaries.

  o New WCI Senior Secured Subordinated PIK Notes, which shall be in the aggregate principal amount of $150 million, and which shall be secured by a priority lien on and security interest in, substantially all of the assets of New WCI and its subsidiaries.

  o New WCI Preferred A Stock, and New WCI Preferred B Stock, each of which shall permit the holder thereof to receive New WCI Common Stock upon the occurrence of certain events, as discussed below.

- The Claims of the Term Lenders and the Revolver Lenders shall be Allowed in the aggregate amount of $735,620,669.77 million (subject to increase based on letter of credit draws occurring prior to the Effective Date, if any).[3]  In full satisfaction of such Claims, the Term Lenders and the Revolver Lenders shall receive (i) 100% of the (a) New WCI Senior Secured Term Notes and (b) New WCI Senior Secured Subordinated PIK Notes, and (ii) 95% of the New WCI Common Stock, except for shares reserved for issuance pursuant to the New WCI Employee Incentive Programs and Creditor Common Shares.

- On the Effective Date, a Creditor Trust shall be established for the benefit of holders of Allowed Unsecured Claims against the Debtors, and the following Assets shall be transferred to the Creditor Trust: (i) $1,000,000 cash, to be used for the administration of the trust; (ii) 5% of the New WCI Common Stock, except for shares reserved for issuance pursuant to the New WCI Employee Incentive Programs and Creditor Common Shares; (iii) the New WCI Preferred A Stock; and (iv) Avoidance Actions that have not been otherwise released under the Plan. The New WCI Preferred A Stock shall provide for dividends as follows: (i) at $525 million in Prepetition Lender Recovery the Creditor Trust shall receive a dividend of an additional 5% of the issued shares of New WCI Common Stock, (ii) at $650 million in Prepetition Lender Recovery the Creditor Trust shall receive a dividend of an additional 5% of the issued shares of New WCI Common Stock, (iii) at $700 million in Prepetition Lender Recovery the Creditor Trust shall receive a dividend of an additional 5% of the issued shares of New WCI Common Stock, and (iii) at Prepetition Lender Recovery in the amount of the Allowed Prepetition Lender Claim the Creditor Trust shall receive a final dividend of an additional 14% of the issued shares of New WCI Common Stock. In full satisfaction of Allowed Unsecured Claims, each holder of an Allowed Unsecured Claim shall receive a Pro Rata Share of the uncertificated, non-transferable beneficial interests in the Creditor Trust.

- On the Effective Date, a Chinese Drywall Trust shall be established for the benefit of holders of Allowed Chinese Drywall Claims against the Debtors, and the following Assets shall be transferred to the Chinese Drywall Trust: (i) $900,000 cash, to be used for the administration of the trust; (ii) the New WCI Preferred B Stock; and (iii) Insurance Coverage Actions, Insurance Recoveries and Chinese Drywall Actions. The New WCI Preferred B Stock shall provide for a dividend as follows:  at Prepetition Lender Recovery in the amount of the Allowed Prepetition Lender Claim the Chinese Drywall Trust shall receive a dividend of 3% of the issued shares of New WCI Common Stock. In full satisfaction of Allowed Chinese Drywall Claims, each holder of an Allowed Chinese Drywall Claim shall receive a Pro Rata Share of the uncertificated, non-transferable beneficial interests in the Chinese Drywall Trust. The Plan provides for a channeling injunction with respect to Chinese Drywall Claims, such that on the Effective Date, liability of all of the Debtors for all Chinese Drywall Claims shall be assumed by, and channeled

---

[3]     The amount of outstanding, undrawn letters of credit as of the date hereof is $31,336,801.09.

to, the Chinese Drywall Trust without further act or deed and satisfied as set forth in the Plan.

- Unsecured Creditors (other than holders of Prepetition Note Claims or Chinese Drywall Claims) with Allowed Claims of less that $135,000 shall receive 2% of the amount of their Allowed Claim in cash on the Plan Distribution Date.

- On the Effective Date, New WCI may, in the business judgment of management, enter into the Exit Facility, which is generally expected to be a new term loan facility with certain of the Prepetition Lenders who agree to participate and shall provide for borrowings not to exceed $110 million and have a term of one year. The proceeds of the Exit Facility, if any, shall be available for use by New WCI to make Plan Distributions to the holders of certain Allowed Claims against the Debtors and to satisfy general working capital requirements of the New WCI Group on and after the Effective Date.

- As set forth in "Certain Affiliate Transactions" below, WCI and its Debtor and non-Debtor affiliates have utilized a centralized cash management system whereby cash received by WCI's operating subsidiaries is transferred to WCI's cash accounts and subsequently transferred from WCI to its subsidiaries to meet operating needs. WCI has also maintained a corporate overhead function through which it has provided shared services to its subsidiaries. Pursuant to the Plan, any and all Intercompany Claims by and between the Debtors and by and between the Debtors and their non-Debtor subsidiaries as of the Effective Date shall be forever waived, discharged, released and enjoined.

- The Plan treats the Estates of the Debtors as comprising a single Estate solely for purposes of voting on the Plan, confirmation of the Plan and making Plan Distributions in respect of Claims against and Equity Interests in such Debtors under the Plan.

- On or prior to the Effective Date, substantially all of the Assets of the Debtors will be transferred to the New WCI Group, which shall be the reorganized Debtors' business enterprise on and after the Effective Date and which shall have NO SUCCESSOR LIABILITY FOR ANY UNASSUMED OBLIGATIONS OF THE DEBTORS.

- After the transfers of Assets described above, all Equity Interests in WCI will be cancelled and WCI will issue new Equity Interests to a trust created under the Plan, and ANY AND ALL NON-DISCHARGEABLE OBLIGATIONS OR CLAIMS NEITHER TREATED NOR PROVIDED FOR UNDER THE PLAN WILL RIDE THROUGH THE PLAN AND THE CHAPTER 11 CASES. SUCH OBLIGATIONS AND CLAIMS WILL REMAIN CONTINGENT LIABILITIES OF WCI, WHICH WILL BE OWNED BY THE TRUST.

**B.     Summary of Distributions Under the Plan.**

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A". In addition, for a more detailed description of the terms and provisions of the Plan, see "The Chapter 11 Plan" section of this Disclosure Statement.

The claim amounts set forth below are based on information contained in the Debtors' Schedules and filed proofs of claim, and reflect what the Debtors believe to be reasonable estimates of the likely resolution of currently outstanding disputed Claims. The amounts utilized may differ materially from the outstanding filed Claim amounts. As discussed below, the Debtors have filed a number of objections to disputed Claims. See "The Reorganization Cases – Debtors' Schedules; Bar Date; Claims Objection and Estimation Procedure."

The following chart summarizes the estimated Plan Distributions to each class on the Plan Distribution Date (unless otherwise provided):[4]

---

[4]     There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

### Administrative and Tax Claims

| Classes of Claims[5] | Treatment of Classes of Claims |
|---|---|
| Administrative Claims<br>Estimated Allowed Claims: $200,000 | On the Plan Distribution Date, each holder of an Allowed Administrative Claim shall receive (i) the amount of such holder's Allowed Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.<br><br>**Estimated Recovery: 100% of Allowed Claim** |
| Tax Claims<br>Estimated Allowed Claims: $7.2 million | At the election of the Debtors, each holder of an Allowed Tax Claim will receive in full satisfaction of such Allowed Tax Claim (i) payments in Cash, in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) a lesser amount in one Cash payment as may be agreed upon in writing by such holder; or (iii) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim or that is less favorable than the treatment provided to the most favored nonpriority Unsecured Claims under the Plan.<br><br>**Estimated Recovery: 100% of Allowed Claim** |

### Claims and Equity Interests

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Class 1 – Priority Claims<br>Estimated Allowed Claims: $500,000<br><br>Unimpaired | Each holder of an Allowed Priority Claim against any of the Debtors shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all legal, equitable, and contractual rights of each holder of an Allowed Priority Claim in respect of such Claim shall be fully reinstated and retained, and such holder of an Allowed Priority Claim shall |

---

[5]    Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

| | |
|---|---|
| | be paid on the Plan Distribution Date in full and in Cash. |
| | **Estimated Recovery: 100% of Allowed Claim** |
| Class 2 – Prepetition Lender Claims<br>Estimated Allowed Claims: $735.6 million<br><br>Impaired | Each holder of an Allowed Prepetition Lender Claim against any of the Debtors shall receive, on the Effective Date, (i) its Pro Rata Share of (A) New WCI Senior Secured Term Notes, (B) New WCI Senior Secured Subordinated PIK Notes, and (C) 95% of the shares of New WCI Common Stock issued under the Plan except for shares reserved for issuance pursuant to the New WCI Employee Incentive Programs and Creditor Common Shares and (ii) the Prepetition Lender Release. |
| | **Estimated Recovery: Undetermined** |
| Class 3 – Secured Claims<br>Estimated Allowed Claims: $28.6 million[6]<br><br>Impaired | Each holder of an Allowed Secured Claim, other than a DIP Claim or Prepetition Lender Claim, against any of the Debtors shall receive on the Plan Distribution Date, in full satisfaction of its Allowed Secured Claim, (i) a single Cash payment equal to the sum of (A) the Allowed Secured Claim and (B) accrued postpetition interest through the Effective Date, at an interest rate agreed to by the parties, or, if no agreement can be reached, as determined by the Bankruptcy Court after notice and a hearing, or (ii) if such Allowed Secured Claim is subject to a valid right of recoupment or setoff, such Claim shall be setoff to the extent of the amount subject to setoff in accordance with sections 506(a) and 553 of the Bankruptcy Code.  Notwithstanding any of the foregoing, the Debtors and any holder of an Allowed Secured Claim may agree to any alternate treatment for such Secured Claim; except that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim. |
| | **Estimated Recovery: 100% of Allowed Claim** |
| Class 4 – Unsecured Claims<br>Estimated Allowed Claims: $979.8 million<br><br>Impaired | Each holder of an Allowed Unsecured Claim against any of the Debtors will receive, on the Plan Distribution Date its Pro Rata Share of 100% of the Creditor Trust Interests.  The Creditor Trust shall receive (i) $1,000,000 cash, to be used for the administration of the trust; (ii) 5% of the New WCI Common Stock, except for shares reserved for issuance pursuant to the New WCI Employee |

---

[6]     Deerfield Investments, Ltd. asserts that it has a Secured Claim and mortgage in an amount not less than $3.55 million, which amount the Debtors dispute.

| | |
|---|---|
| | Incentive Programs; (iii) the New WCI Preferred A Stock; and (iv) Avoidance Actions that have not been otherwise released under the Plan.<br><br>**Estimated Recovery: Undetermined** |
| Class 5 – Chinese Drywall Claims<br>Estimated Allowed Claims: $40.0 million<br><br>Impaired | Each holder of an Allowed Chinese Drywall Claim against any of the Debtors will receive, on the Plan Distribution Date, its Pro Rata Share of 100% of the Chinese Drywall Trust Interests.  The Chinese Drywall Trust shall receive (i) $900,000 cash, to be used for the administration of the trust; (ii) the New WCI Preferred B Stock; and (iii) Insurance Coverage Actions, Insurance Recoveries and Chinese Drywall Actions.<br><br>**Estimated Recovery: Undetermined** |
| Class 6 – Convenience Claims<br>Estimated Allowed Claims: $22.3 million[7]<br><br>Impaired | Each holder of an Allowed Convenience Claim shall receive on the Plan Distribution Date a single Cash payment in an amount equal to 2% of the amount of such holder's Allowed Convenience Claim.<br><br>**Estimated Recovery: 2% of Allowed Claim** |
| Class 7 –  WCI Equity Interests<br>Estimated Allowed WCI Equity Interests: N/A<br><br>Impaired | On the Effective Date, all Equity Interests in WCI shall be cancelled, and each holder of an Equity Interest in WCI shall not be entitled to any distribution under the Plan.<br><br>**Estimated Recovery: None** |
| Class 8 – Other Equity Interests<br>Estimated Allowed Other Equity Interests: N/A<br><br>Unimpaired | Each holder of an Allowed Equity Interest in the Debtors, other than in WCI, shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which such Equity Interests entitle such holder in respect of such Equity Interests shall be fully reinstated and retained on and after the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Equity Interest** |

## V.

## <u>GENERAL INFORMATION</u>

The discussion below briefly describes the Debtors and their businesses as they exist as of the date of this Disclosure Statement.

---

[7]     Pursuant to the Convenience Class Election, holders of Unsecured Claims other than Prepetition Note Claims may elect to reduce their Allowed Claims, in their entirety, to $135,000, and thereby receive treatment in Class 6 – Convenience Claims in full satisfaction of all of their Allowed Claims.  As such, the estimated amount of Allowed Convenience Claims may increase based on the number of creditors electing the Convenience Class Election.

A.      **Overview of the Debtors.**

WCI, together with its Debtor and non-Debtor affiliates (collectively, the "Company"), is a fully integrated homebuilding and real estate services company with over 50 years of experience in the design, construction and operation of leisure-oriented, amenity-rich master-planned communities. The organizational charts attached hereto as Exhibit "F" illustrate the structure of WCI and its subsidiaries as of the Petition Date.

The Company master plans, designs, builds and sells in residential communities consisting of single- and multi-family homes, as well as luxury residential tower units. With respect to the development of each community, the Company starts with the acquisition of raw land; designs and obtains the necessary approvals for the land's development; prepares the land for construction; installs the necessary infrastructure; constructs the residences; markets and sells the individual homes, units or properties (as applicable); designs, builds and, in many cases, operates and manages the amenities associated with the project (such as golf courses and health clubs); and otherwise controls most aspects of the community's planning, design, development, construction and operation. In certain situations, the Company also sells parcels and lots to other builders, developers and end-users.

The Company's corporate headquarters are located in Bonita Springs, Florida. The Company conducts development and homebuilding operations in the following markets:

- Florida

    o  East Coast — Fort Lauderdale, Miami Beach, West Palm Beach, Palm Coast, Daytona Beach and Jacksonville; and

    o  West Coast — Naples, Fort Myers, Sarasota/Bradenton/Venice, Tampa and Pensacola;

- New York — Dutchess and Suffolk Counties;

- New Jersey — Hudson County;

- Connecticut — Fairfield County;

- Virginia — Arlington, Fairfax and Loudoun Counties; and

- Maryland — Howard County.

As of December 31, 2008, the Company had approximately 54 locations at which it was building or selling single- and multi-family homes or mid- and high-rise residential units.

**B.     Business and Properties of the Debtors.**

### 1.     Core Business Operations.

The Company's principal business segments include single- and multi-family (traditional) homebuilding, mid- and high-rise (tower) homebuilding, and real estate services. The Company also develops and operates amenity facilities, sells selected land parcels, and enters into real estate joint ventures, generally within its own communities. Each of these business components is described below.

#### a.     *Traditional Homebuilding*

The Company designs, builds and sells traditional homes ("Homes") to primary, second-home, move-up and retirement home buyers, which range from approximately 1,000 square feet to over 6,000 square feet in living space and which had an average selling price for the year ended 2008 of $491,000. During the first quarter of 2009, the Company suspended new home construction activities pending a market recovery. The Company normally serves as the general contractor in the construction of its traditional Homes and constructs most of these Homes within its master-planned communities, which often feature upscale amenities, including hotels, such as Ritz-Carlton and Hyatt, as well as golf courses designed by Raymond Floyd, Peter Jacobson, Greg Norman and other notable golf course architects.

Additionally, the Company sells selected lots directly to other builders or consumers for the design and construction of custom homes. The Company also historically built speculative Homes to enhance its marketing and sales efforts to prospective homebuyers and independent brokers.

The declining real estate market and related high cancellation and default rates that have negatively impacted homebuilders nationwide have increased the Company's inventory of unsold completed single- and multi-family Homes. As of the date of this Disclosure Statement, the Company has approximately 180 unsold Homes in inventory.

#### b.     *Tower Homebuilding*

The Company manages the design and build process and sells luxury residential tower units ("Tower Residences") and condominium hotels, including two managed and operated under the Regent International and Starwood Luxury Collection brands, targeting primary and affluent, leisure-oriented home purchasers. Tower Residences range in size from approximately 500 square feet to over 11,000 square feet in living space and had an average selling price for the year ended 2008 of $833,000. As the developer of these towers, the Company manages the entire process. The Company (a) hires experienced and bonded third-party general contractors specializing in the construction of residential towers to build the structures, (b) plans and designs the towers by directly retaining the services of architects and engineers and, ultimately, (c) delivers the condominium association to residents. Among other locations, the Company develops Tower Residences primarily on the east and west coasts of Florida, but also in Virginia, Maryland and New Jersey.

Currently, the Company does not have any new Tower Residences under construction and has no plans to commence new tower development and construction until a market recovery occurs. The Company continues to maintain sales staff or resale Realtors at its towers to sell Tower Residences that have been constructed but not yet sold. As of the date of this Disclosure Statement, the Company had approximately 340 Tower Residences in inventory.

### c.    *Marketing and Sales*

The Company's marketing programs reach prospective purchasers through a targeted strategy that includes print media, direct mail, newsletters, internet marketing, on-site community events and Realtor outreach. All production, graphics, web design and e-marketing is provided by the Company's in-house marketing department. The Company's database marketing program is one of the most in-depth for builders and developers, focusing on a variety of information that provides the on-site sales teams with pertinent data to their customers' buying decision. This data is entered within 24 hours to further assist the on-site team with detailed traffic reports. In addition, the Company's contact center originates the prospecting process to properly qualify a customer for the appropriate communities, including setting up visits, Preferred Guest Getaway stays and follow-up schedules. The Company also maintains sales centers in many communities with sales staff, complemented by on-site model homes and tower residences. Typically, to reserve a Home or Tower Residence, a purchaser will enter into a sales agreement and provide the Company with a refundable cash payment. The sales agreement normally involves a short rescission period depending on the jurisdiction, after which the agreement becomes binding on both parties and the deposit becomes partially or entirely nonrefundable, subject to any applicable Housing and Urban Development regulations. The nonrefundable deposit requirements generally approximate 10% of the purchase price for Homes and 10% to 20% of the total purchase price for Tower Residences.

### d.    *Real Estate Services*

The Company has a franchise agreement with Prudential Real Estates Affiliates, Inc. ("Prudential"), providing the Company with the exclusive right to offer residential brokerage services as Watermark Realty Inc. d/b/a Prudential Florida WCI Realty ("Watermark Realty") in Lee, Collier, Martin, Palm Beach, Broward, Charlotte, and Miami-Dade counties, and in portions of Hillsborough and Manatee Counties. Under this agreement, the Company pays Prudential a monthly royalty based on gross commission revenue. Additionally, Watermark Realty provides brokerage services for new homes and certain resales. In communities where low inventory levels have been achieved, Watermark Realty agents handle sales functions as opposed to fixed overhead sales-staff employees. Watermark Realty is not a Debtor in these Chapter 11 Cases.

The Company provides title insurance and closing services through First Fidelity Title, Inc. ("First Fidelity"), which conducts business under the trade names WCI Title and Florida Title & Settlement. First Fidelity underwrites its policies on behalf of large national title insurers and derives its revenues from commissions on title insurance premiums and closing services provided to its customers, third-party residential closings and commercial closings.

Prior to June 2006, the Company provided residential mortgage banking services to its buyers, as well as third-party purchasers. In June 2006, the Company formed WCI Mortgage

LLC ("WCI Mortgage"), a joint venture with an affiliate of Wells Fargo Bank, as its exclusive provider of residential mortgage banking services.  WCI Mortgage originates home mortgages which are subsequently sold to mortgage investors.  WCI Mortgage is not a Debtor in these Chapter 11 Cases.

    **e.**  *Amenity Membership and Joint Venture/Partnership Operations*

    The Company designs, builds and operates, and sells memberships concerning community amenities, which include championship golf courses with clubhouses, fitness, tennis and recreational facilities, guest lodging, marinas and a variety of restaurants, which are central to its mission to deliver high-quality residential lifestyles.  These community amenities are owned by community residents or non-residents through equity club membership programs, community residents through their homeowners' or condominium association, unaffiliated third-parties, or by the Company directly.

    The Company also has seven (7) active real estate joint ventures with third parties that are engaged in mortgage banking (as described above), land development and golf course operations.  These joint ventures are utilized to acquire, develop, market and operate homebuilding, timeshare, amenities and/or real estate services activities.  None of the equity club entities, homeowners' or condominium associations, or joint venture entities are Debtors in these Chapter 11 Cases.

    **2.**  **Debtors' Future Plans for Continuing Business Operations.**

    The Company has developed a five-year business plan for its continuing business operations upon emergence from chapter 11.  In general, this business plan calls for the generation of cash-flow by the Company through the sale of spec inventory, through a retail and builder lot sale program, as well as through the sale of certain non-core bulk assets.  These activities provide the Company the option during or after the end of the five-year plan period to recommence land acquisition, new land development and/or home building and tower activities, or alternatively to sell all remaining core assets as the macro-economic situation evolves and changes.  The business plan also calls for the continuing operation of clubs and amenities not otherwise identified as non-core assets.

    The Company's five-year business plan contemplates selling all spec inventory and certain non-core assets during 2009–2010.  The plan further provides that the Company will continue to sell non-core bulk assets and to sell lots, both retail and to builders, and to operate as a land holding and development company during 2010–2013.  Specific activities during this period will include maintaining entitlements, selling individual custom lots, selling pods within communities or bulk sales of entire communities, continued operation of any remaining community amenities businesses and continued operation of the Company's real estate services businesses.  Once again, during and after the five-year business plan period, the Company will have the option to recommence business as a land acquirer, developer and/or a home builder with the remaining core assets or sell the remaining assets at higher valuations due to expected market recovery over the five-year period.

### 3.    **Employees.**

As of May 31, 2009, the Company employs approximately 1,200 total non-union employees nationally, including approximately: 264 core employees, 160 real estate services employees and 783 amenities employees.  As the Company reduces its spec inventory and, subsequently, lot inventory levels, employee headcounts will be adjusted accordingly.  Among other things, the Company's employees (a) manage and monitor construction of new homes that are currently underway and will do so until these remaining new construction homes are completed, (b) participate in major design and building decisions, (c) coordinate the activities of subcontractors and suppliers, (d) review the work of subcontractors for quality and cost controls, (e) monitor compliance with zoning and building codes, (f) maintain entitlements, (g) manage and operate amenities and golf clubs and courses, (h) carry out home warranty obligations and (i) play a significant role in working with the Debtors' homebuyers by assisting with option selection and home modification decisions, educating buyers on the construction process and instructing buyers on post-closing home maintenance.

In the ordinary course of business, the Debtors have established various employee benefit plans and policies for the benefit of their employees, which include medical and health insurance, life insurance, disability benefits, dental insurance, disability coverage, vacation pay, a 401(k) plan, and other similar benefits.  In addition, as described in "The Reorganization Cases – Key Employee Incentive Plan," below, the Debtors have implemented a comprehensive key employee incentive plan to incent their key executives and managers to achieve certain performance and operational goals during the Chapter 11 Cases.

### 4.    **Management.**

It is anticipated that the members of the board of directors and the officers of each of the Debtors who are serving as of the Confirmation Date will continue to serve in such capacities until the Effective Date.  Entry of the Confirmation Order shall ratify and approve all actions taken by the board of directors and the officers of the Debtors from the Petition Date through and until the Effective Date.  Below is a list of the executive officers of the Company, along with a brief biography of each officer.

| Name | Position(s) | Position Commencement Date |
| --- | --- | --- |
| David L. Fry | Interim President and Chief Executive Officer | 8/4/2008 |
| Jonathan M. Pertchik | Chief Restructuring Officer | 8/26/2008 |
| Russell Devendorf | Senior Vice President and Chief Financial Officer | 11/22/2008 |
| Vivien N. Hastings | Senior Vice President and General Counsel | 2/24/1999 |

| Timothy J. Oak | Regional President - Florida Home Building and Towers | 12/12/2008 |
| Paul D. Appolonia | Senior Vice President - Human Resources | 5/28/2002 |
| Reinaldo L. Mesa | Division President - Real Estate Services | 2/1/2006 |

*David L. Fry.* Mr. Fry currently has served as WCI's Interim President and Chief Executive Officer since August 2008. Mr. Fry joined WCI in 1995 as Vice President of Amenities, and has subsequently served in several other senior roles, including WCI's Traditional Homebuilding Division West Central Florida Region President and Senior Vice President of the Real Estate Services and Amenities Divisions. He was named Chief Operating Officer in 2006. Prior to 1995, Mr. Fry served as the Golf Operations Director of the South Seas Resort Company.

*Jonathan M. Pertchik.* Mr. Pertchik has served as WCI's Chief Restructuring Officer since August 2008. He is responsible for managing the Company's reorganization through the chapter 11 process. Previously, Mr. Pertchik served WCI in the capacity as Division President Florida East Coast as well as Vice President of Operations - Tower Division. Prior to joining WCI in 2005, Mr. Pertchik served as Senior Vice President and Managing Principal of The Staubach Company. Mr. Pertchik is a former practicing attorney and is a member of the Florida Bar.

*Russell Devendorf.* Mr. Devendorf joined WCI in November 2008 as Senior Vice President and Chief Financial Officer. Mr. Devendorf previously served as Vice President – Finance for homebuilder Meritage Homes Corporation since May 2008, prior to which he was employed by homebuilder TOUSA, Inc., where he held several financial and accounting management positions over a six year period, most recently Vice President and Treasurer. Mr. Devendorf also served as a senior auditor at Ernst & Young, LLP in their real estate practice and is a Certified Public Accountant and Certified Treasury Professional.

*Vivien N. Hastings.* Ms. Hastings is the Senior Vice President and General Counsel for WCI and has held the position since 1998. In 1995, Ms. Hastings was Senior Vice President and General Counsel of WCI Communities Limited Partnership. Prior to her role as General Counsel, she held various positions in WCI Communities Limited Partnership's legal department. From 1982 to 1989, Ms. Hastings served as Vice President and Co-General Counsel of Merrill Lynch Hubbard, Inc., a real estate division of Merrill Lynch & Co. Prior to her tenure with Merrill Lynch, she was an associate with the law firm of Winston & Strawn LLP.

*Timothy J. Oak.* Timothy J. Oak is the Regional President of all Florida Home Building and Towers operations and sales activities. Mr. Oak was promoted to this role in December 2008. Previously, he served as Regional President for all Florida Home Building and in 2007 he was given responsibility for both the Home Building and Tower operations for the Florida West

18

Coast region. Mr. Oak joined WCI in 1995 with the merger of Florida Design Communities as the Vice President of Construction and has served in several progressive executive level positions within the Home Building business line since then. Mr. Oak was promoted to Division President in 2001 and assumed the responsibilities of Regional President in 2006. Mr. Oak has over 23 years experience in construction and real estate development.

*Paul D. Appolonia.*  Mr. Appolonia has served as WCI's Senior Vice President of Human Resources since May 2002 and is responsible for the recruitment, training and development, retention, employee benefits and compensation of thousands of WCI professionals and employees. During his tenure at WCI, the company has expanded into several new markets in Florida, as well as the Northeast and Mid-Atlantic, adding staff in each of the new areas. Prior to joining WCI in 2002, Mr. Appolonia was the Vice President of Human Resources and Corporate Services for Orius Corporation. He also led Human Resources and Corporate Services for Ocwen Financial Corporation, Inc. as a Vice President. Mr. Appolonia brings 31 years of human resources and personnel management experience to WCI.

*Reinaldo L. Mesa.*  Mr. Mesa has served as the Division President of WCI's Real Estate Services business segment since February 2006. He also serves as President and Chief Operating Officer of Prudential Florida Realty. Real Estate Services encompasses the operating business units of Florida Title & Guarantee, Florida Home & General Lines Insurance, Florida Home Finance Group (an affiliate of Wells Fargo Home Mortgage), and Prudential Florida Realty. Mr. Mesa joined Prudential Florida Realty's management team in 1999 and was promoted to President and Chief Operating Officer in 2004. Prior to joining WCI, Mr. Mesa had owned his own real estate brokerage firm in Florida, which he sold to Coldwell Banker Residential Real Estate. Mr. Mesa then served as Miami-Dade District Manager with Coldwell Banker. Mr. Mesa has more than 27 years of experience in the real estate industry and holds Florida and Alabama Real Estate Broker licenses and several industry designations.

## C.    Prepetition Capital Structure.

As of June 30, 2008, the Company's consolidated balance sheet reflected total assets of approximately $2,178,179,000. Of this amount, approximately $61,130,000 was comprised of cash and cash equivalents, $227,983,000 was comprised of property and equipment, $1,655,434,000 was comprised of real estate inventories, $58,841,000 was comprised of contracts receivables, and approximately $174,791,000 was comprised of other assets. The Company's consolidated balance sheet also reflected total liabilities of approximately $1,915,034,000.

As of the Petition Date, the Company had unrestricted cash or cash equivalents of approximately $50 million and approximately $10 million in cash collateral accounts with Bank of America, N.A.

Senior Debt. As of the Petition Date, the Company was party to various financing facilities, including (a) the Senior Term Loan Agreement with Keybank, National Association, as administrative agent, and the other lenders party thereto (the "Term Lenders"), dated as of December 23, 2005 (as amended, supplemented, modified or otherwise in effect from time to time, the "Term Facility"), (b) the Revolving Credit Agreement with Bank of America, N.A., as

administrative agent (the "Revolver Agent"), and the other lenders party thereto ("Revolver Lenders"), dated as of June 13, 2006 (as amended, supplemented, modified or otherwise in effect from time to time, the "Revolving Facility"), and (c) the Amended and Restated Revolving Credit Construction Loan Agreement with Wachovia Bank, National Association, as administrative agent, and other lenders party thereto (the "Tower Lenders," and together with the Term Lenders and Revolver Lenders, the "Prepetition Lenders"), dated as of September 22, 2005 (as amended, supplemented, modified or otherwise in effect from time to time, the "Tower Facility" and, together with the Term Facility and the Revolving Facility, the "Prepetition Credit Facilities"). The Prepetition Credit Facilities have been amended a number of times to address specifically the downturn in the Company's financial condition.

Pursuant to the terms of the Prepetition Credit Facilities, the obligations under the Tower Facility, the Term Facility and the Revolving Facility (together with all accrued and unpaid interest, fees and other amounts outstanding under the Prepetition Credit Facilities, the "Prepetition Obligations") were guaranteed by substantially all of WCI's direct and indirect wholly-owned subsidiaries (the "Guarantors") and secured by substantially all of the Company's assets (the "Prepetition Collateral"). Pursuant to the terms of an intercreditor agreement between and among the Tower Lenders, on the one hand, and the Term Lenders and the Revolver Lenders, on the other hand, the Tower Lenders had priority to, and their agent controlled enforcement of lien rights in, the tower-related assets, and the Term and Revolver Lenders had priority to, and the Revolver Agent controlled enforcement of lien rights in, all other Prepetition Collateral.

As of the Petition Date, the aggregate indebtedness under the Prepetition Credit Facilities was approximately $772,809,000, with approximately $224,830,000 being owed under the Term Facility, approximately $498,924,000 (not including approximately $36,000,000 of outstanding, but undrawn, letters of credit) being owed under the Revolving Facility and approximately $49,055,000 being owed under the Tower Facility.[8]

Senior Subordinated Notes. In March 2005, WCI issued $200 million of 6-5/8% senior subordinated notes due March 15, 2015 (the "2015 Notes"). In September 2003, WCI issued $125 million of 7-7/8% senior subordinated notes due October 1, 2013 (the "2013 Notes"). In April 2002, WCI issued $200 million of 9-1/8% senior subordinated notes due May 1, 2012 (together with the 2015 Notes and the 2013 Notes, the "Senior Subordinated Notes").[9] The Senior Subordinated Notes are guaranteed by substantially all of WCI's direct and indirect wholly-owned subsidiaries; payment is subordinated to the payment in full of all "senior debt," which includes the Prepetition Obligations but excludes trade claims. As of the Petition Date, the full face amount of the Senior Subordinated Notes was outstanding.

---

[8]     As discussed below, proceeds from the Debtors' postpetition debtor-in-possession financing were used to repay the Tower Lenders the outstanding balance under the Tower Facility.

[9]     In February 2001, WCI issued $250 million of 10-5/8% senior subordinated notes due February 15, 2011 and, in June 2001, WCI issued an additional $100 million of 10-5/8% senior subordinated notes due February 15, 2011. As of December 31, 2006, however, WCI had repurchased the entire $350 million principal amount of the 10-5/8% notes.

Junior Subordinated Notes. In February 2006, WCI issued $65 million of 7.54% junior subordinated notes payable quarterly through April 30, 2016, and thereafter at a variable rate maturing April 30, 2036 (the "7.54% Notes"). In September 2005, WCI issued $100 million of 7.25% junior subordinated notes in a private placement payable quarterly through October 30, 2015, and thereafter at a variable rate maturing October 30, 2035 (the "7.25% Notes," and together with the 7.54% Notes, the "Junior Subordinated Notes"). The Junior Subordinated Notes are guaranteed by substantially all of WCI's direct and indirect wholly owned subsidiaries; payment is subordinated to all Senior Debt. As of the Petition Date, the full face amount of the Junior Subordinated Notes was outstanding.

Contingent Convertible Senior Subordinated Notes. In August 2003, WCI issued $125 million of 4.0% contingent convertible senior subordinated notes due 2023 (the "Convertible Notes"). The Convertible Notes are guaranteed by substantially all direct and indirect wholly owned subsidiaries of WCI; payment is subordinated to all Senior Debt.

## D.      Events Leading to the Commencement of the Chapter 11 Cases.

In 2007 and 2008, WCI and other homebuilders were hit with the perfect storm of economic events following a rapid run-up in values that proved to be unsustainable. In the summer of 2007, the homebuilding industry was rocked by the collapse of the sub-prime mortgage industry, which placed a stranglehold on the ability of many borrowers to obtain financing to purchase new homes. Then, in the fall of 2007, a broad dislocation occurred in the credit markets which further constricted the availability of home credit in general and home mortgage financing in particular. The resulting absence of available financing for homebuyers, both existing and future, combined with the unavailability of commercial credit, has severely and negatively impacted the homebuilding industry and pushed a number of other homebuilders to seek relief under chapter 11 of the Bankruptcy Code. This material downturn in the residential real estate business occurred nationally, with Florida being hit particularly hard. According to the U.S. Census Bureau, sales of new homes in the United States declined from 1,073,000 in June of 2006 to 793,000 in June of 2007 and, again, to 530,000 in June of 2008.[10] In Florida, sales of single-family homes, both new and existing, declined by 24.46% from 2005 to 2006 (from 444,916 total sales to 336,093 total sales), after six years of continuous growth.[11]

Along with declining sales, prices of homes also sharply declined as a result of the sub-prime mortgage crisis and the credit market dislocation, making it unfeasible for homebuilders to continue development and building activities in many markets. As compared to net sales of 65 Tower Residences and 750 single-family Homes in 2006, the Company had negative net sales of Tower Residences due to defaults and sold 439 net single-family Homes in 2007 and had negative net sales of Tower Residences due to defaults and sold 273 net single-family Homes in

---

[10]      See U.S. Census Bureau, New Residential Sales in June 2007, dated July 26, 2007, http://www.census.gov/const/newressales_200706.pdf; U.S. Census Bureau, New Residential Sales in June 2008, dated July 25, 2008, http://www.census.gov/const/newressales_200806.pdf.

[11]      See Florida Housing Data Clearinghouse, Construction and Sales: Results, http://flhousingdata.shimberg.ufl.edu/a/construction_sales?report=a2_year_built&report=a_11_sales_sf&report=a_1 4_mean_sales_price_sf&report=a_17_median_sales_price_sf&report=a_20_sales_price_increment_sf&report=a_23 _sales_homestead_sf&action=results&nid=1&go.x=9&go.y=5.

2008. The average price for single-family Homes sold likewise declined from \$738,000 in 2006 to \$439,000 in 2007 and increased to \$454,000 in 2008.

As a result of the decline in its business, the Company was forced to amend the Prepetition Credit Facilities several times, most recently in January and March of 2008. First, on January 16, 2008, the Company obtained amendments to the Term Facility and the Revolving Facility, which extended through June 30, 2009, modified, suspended, or waived certain covenants, thereby providing the Company with improved operating and financial flexibility. These amendments also reduced the total commitment available under the Revolving Facility and the outstanding amount due under the Term Facility, converted a portion of the Revolving Facility to non-revolving status and increased the pricing on the loans.

Second, on March 17, 2008, the Company was able to obtain a waiver of the requirement under its Prepetition Credit Facilities to submit annual consolidated financial statements accompanied by a report and opinion that was not subject to a "going concern" qualification or exception from its lenders under the Prepetition Credit Facilities. In addition to the waiver, on March 17, 2008, the Company negotiated for and received certain amendments to the Tower Facility. These amendments (a) provided for consistencies with the governing provisions of, as well as cross collateralization on a subordinate basis with, the Term Facility and Revolving Facility and (b) limited the Tower Facility to one further advance on March 31, 2008 if certain financial criteria were met, which advance was not funded. As part of these amendments, the Term and Revolver Lenders agreed not to declare the Company in default.

The holders of the Convertible Notes (the "Convertible Noteholders") had an option which, if exercised, would have required WCI to repurchase 100 percent of the aggregate principal amount of the outstanding Convertible Notes plus accrued but unpaid interest on August 5, 2008. On June 25, 2008, WCI received notice that certain of the Convertible Noteholders intended to exercise this right. The Company anticipated that it would not have sufficient liquidity to satisfy its obligation to repurchase the outstanding Convertible Notes, and that the failure to satisfy such obligation could trigger the rights of the Convertible Noteholders to exercise remedies specified in the governing indenture, including accelerating the maturity of the notes, which could result in the acceleration of substantially all of the Company's other outstanding indebtedness.

In an attempt to avoid the impending default under the Convertible Notes, WCI undertook to exchange, prior to August 5, 2008, all \$125 million of the Convertible Notes for new notes maturing on April 1, 2012. Specifically, on July 8, 2008, WCI issued an offering memorandum which was amended on July 22, 2008 (as amended, the "Exchange Offer") to exchange \$1,000 principal amount of new 17.5% senior secured notes due 2012 and a warrant to purchase 33.7392 shares of common stock of WCI for each \$1,000 principal amount of WCI outstanding Convertible Notes validly tendered and accepted. Interest under the new 17.5% senior secured notes due 2012 was to be paid entirely in cash, in kind, or in a combination thereof. The new 17.5% senior secured notes due 2012 were to be secured by third priority liens in substantially all the tangible and intangible assets of the Company and have priority over the Senior Subordinated Notes and the Junior Subordinated Notes.

22

The Exchange Offer was to expire at midnight on August 4, 2008, and was conditioned upon a 90% minimum tender and consummation of the amendment and restatement of the Company's existing credit facilities and the issuance of certain new second lien notes, the proceeds of which would be used to pay down a portion of the Company's Prepetition Obligations. In the event the necessary minimum tender was not achieved, WCI could terminate the Exchange Offer at any time prior to acceptance of the Convertible Notes tendered.

In addition, the Company was required to deliver a certificate, ten business days prior to the August 5, 2008 deadline to repurchase the Convertible Notes, certifying that no default or event of default under the Term Facility and Revolving Facility would exist before or after giving effect to, on a pro forma basis, the repurchase of the Convertible Notes. The Company was unable to deliver such certificate and, accordingly, provided notice on July 22, 2008 to the administrative agents under the Revolving Facility and Term Facility of the occurrence of a default. As a result, the Company was at risk of the Term and Revolver Lenders exercising remedies specified in the Revolving Facility or the Term Facility, including accelerating the maturity of the loans, which in turn could have resulted in the acceleration of substantially all of Company's other outstanding indebtedness.

Prior to the Petition Date, WCI was informed that various conditions of its proposed restructuring would not be satisfied. In order to prevent the consequences of the existing default under the Term Facility and Revolving Facility and the impending default under the Convertible Notes indenture, and in order to restructure the capital of the Company, WCI and the other Debtors commenced these cases under chapter 11 of the Bankruptcy Code.

## VI.

## CERTAIN AFFILIATE TRANSACTIONS

### A.    Overview.

As part of the business of the Debtors, WCI and its subsidiaries have entered into a variety of intercompany relationships and transactions. Specifically, since its formation, the Company has, in large part, utilized an integrated cash management system that provides mechanisms for the collection, concentration, management and disbursement of funds used in the Debtors' and their non-Debtor affiliates' business operations. Also since its formation, WCI has maintained a corporate overhead function through which it has provided shared services to its subsidiaries in a number of areas, as discussed further below.

The discussion that follows provides an overview of the aforementioned intercompany relationships and transactions.

### B.    Centralized Cash Management.

Since its inception, in the ordinary course of business, the Company utilized, with certain limited exceptions, a centralized cash management system whereby cash received by its operating subsidiaries and amenities clubs is swept to WCI's cash accounts either through an automated sweep process or periodic manual sweeps. Similarly, as these operating subsidiaries and clubs required cash to cover presentments of operating disbursements, WCI would fund the

subsidiaries and clubs from its centralized cash management pool. To account for the transfers of cash and non-cash transactions, WCI typically established intercompany accounts maintained on the WCI general ledger and correspondingly the operating subsidiaries and clubs maintained intercompany accounts to track transactions with WCI.

Specifically, with certain exceptions, the Debtors' cash management system primarily revolves around the master account held by WCI, into which substantially all of the funds received by the Debtors and their affiliates are either directly deposited or automatically swept nightly from various zero-balance accounts. The funds deposited historically included, among other things, revenues from (a) the Debtors' homebuilding operations, (b) the sale of equity memberships and marina slips, non-equity memberships, billed membership dues and fees for services provided with respect to the Debtors' amenities operations and (c) other miscellaneous revenues generated from ancillary business operations.

Daily disbursements are generally made from controlled disbursement accounts held in the name of WCI or one of its affiliates. Disbursements from these accounts are funded through manual transfers from WCI's master account and typically include disbursements for the payment of (a) operating expenses and other accounts payable, (b) taxes, (c) certain employee payroll direct deposits and (d) other employee-related expenses. The Debtors' payroll is handled through Automatic Data Processing, Inc. ("ADP") and funded pursuant to automated clearing house transfers from WCI's master account to ADP.

The Debtors' various amenity clubs also maintain numerous operating and merchant accounts at various banks. Through these club accounts, funds received from the operation of the various recreational amenities offered by the Debtors are processed and swept daily either directly into the WCI's master account or through other concentration accounts.

## C.   Corporate Overhead.

Since its formation, WCI has maintained a corporate overhead function through which it has provided a number of shared services to its subsidiaries in a number of areas, including, but not limited to, executive management, legal, treasury, accounting, tax, finance, risk management, information technology and human resources.

## D.   Treatment of Intercompany Claims under the Plan.

Except as otherwise provided in the Plan, Intercompany Claims and Administrative Claims between and among the Debtors shall, solely for purposes of receiving Plan Distributions, be deemed resolved as a result of the settlement and compromise described in Section 2.1 of the Plan and therefore not entitled to any Plan Distribution and shall not be entitled to vote on the Plan.

## VII.

## SELECTED FINANCIAL INFORMATION

**A.    Annual Financial Information for WCI.**

For the year ended December 31, 2008, WCI reported a $936,796,000 net loss on a consolidated basis.  The total cash and cash equivalents of WCI and its subsidiaries, on a consolidated basis, as of December 31, 2008 was approximately $113,210,000.

For the year ended December 31, 2007, WCI reported a $578,531,000 net loss on a consolidated basis.  The total cash and cash equivalents of WCI and its subsidiaries, on a consolidated basis, as of December 31, 2007 was approximately $188,821,000.

For the year ended December 31, 2006, WCI reported net income of $9,014,000 on a consolidated basis.

**B.    Financial Statements for WCI.**

The annual financial statements should be read in conjunction with the financial statements and notes thereto included in WCI's Annual Report on Form 10-K for the year ended December 31, 2008 that was filed on May 8, 2009, which is available at the SEC's website at www.sec.gov and on WCI's website at www.wcicommunities.com/investors.  The March 31, 2009 financial statements should be read in conjunction with the financial statements and notes thereto available on WCI's website at www.wcicommunities.com/investors.

**WCI Communities, Inc.**
**Debtor-in-Possession**
**Condensed Consolidated Balance Sheets**
**(In thousands)**

| | March 31 | December 31, | |
|---|---|---|---|
| | **2009** | **2008 (1)** | **2007(1)** |
| | **(Unaudited)** | | |
| **Assets** | | | |
| Cash and cash equivalents | $123,919 | $113,210 | $188,821 |
| Restricted cash | 12,830 | 12,258 | 20,360 |
| Contracts receivable | - | - | 358,327 |
| Mortgage notes and accounts receivable | 13,298 | 13,781 | 19,138 |
| Real estate inventories | 972,086 | 1,021,959 | 1,848,309 |
| Property and equipment, net | 180,409 | 183,629 | 236,429 |
| Other assets | 129,154 | 133,123 | 219,847 |
| Total assets | $ 1,431,696 | $ 1,477,960 | $ 2,891,231 |
| | | | |
| **Liabilities and Shareholders' Equity** | | | |
| | | | |
| Accounts payable and other liabilities | 113,781 | 102,773 | 241,990 |
| Customer deposits | 26,417 | 26,343 | 188,060 |
| Community development district obligations | 55,119 | 54,694 | 87,870 |
| Senior secured revolving credit facility | 498,924 | 498,924 | 545,975 |
| Senior secured term note | 224,829 | 224,829 | 262,500 |
| Debtor-in-possession term note | 72,918 | 77,081 | - |
| Mortgages and notes payable | 1,775 | 1,775 | 300,125 |
| Senior subordinated notes | - | - | 525,000 |
| Junior subordinated notes | - | - | 165,000 |
| Contingent convertible senior subordinated notes | - | - | 125,000 |
| | 993,763 | 986,419 | 2,441,520 |
| Liabilities subject to compromise | 977,110 | 979,527 | - |
| Minority Interests | - | 26,600 | 29,677 |
| Commitments and contingencies | - | - | - |
| | | | |
| Shareholders' (deficit) equity: | | | |
| Common stock, $.01 par value, per share | 470 | 469 | 468 |
| Additional paid-in capital | 309,481 | 299,824 | 297,714 |
| (Accumulated deficit) retained earnings | (768,056) | (706,737) | 230,059 |
| Treasury stock, at cost | (108,144) | (108,142) | (108,090) |
| Accumulated other comprehensive loss | - | - | (117) |
| | | | |
| Total WCI Communities, Inc. shareholders' (deficit) equity | (566,249) | (514,586) | 420,034 |
| Noncontrolling interests | 27,072 | - | - |
| Total shareholders' (deficit) equity | (539,177) | (514,586) | 420,034 |
| Total liabilities and shareholders' (deficit) equity | $ 1,431,696 | $ 1,477,960 | $ 2,891,231 |

(1)The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

**WCI Communities, Inc.**
**Debtor-in-Possession**
**Condensed Consolidated Statements of Operations**
**(In thousands)**

| | For the three months ended March 31, | For the years ended December 31, | |
|---|---|---|---|
| | **2009** | **2008(1)** | **2007(1)** |
| **Revenues** | | | |
| Homebuilding | 73,100 | 328,826 | 747,765 |
| Real estate services | 15,104 | 72,477 | 91,840 |
| Other | 18,251 | 154,774 | 96,771 |
| Total revenues | $ 106,455 | $ 556,077 | $ 936,376 |
| **Cost of Sales** | | | |
| Homebuilding | 68,107 | 913,360 | 1,036,414 |
| Real estate services | 15,241 | 71,571 | 89,436 |
| Other | 15,557 | 188,655 | 116,360 |
| Total costs of sales | 98,905 | 1,173,586 | 1,242,210 |
| Gross margin | 7,550 | (617,509) | (305,834) |
| **Other Income and Expenses** | | | |
| Equity in (earnings) losses from joint ventures | 5 | (514) | (488) |
| Other expense (income) | 240 | 18,123 | (219) |
| Impairment of investments in joint ventures | – | 4,480 | 10,748 |
| Impairment of property and equipment | – | 36,616 | – |
| Market valuation on interest rate swap | – | 929 | 8,756 |
| Hurricane recoveries | – | – | (7,759) |
| Selling, general, administrative and other | 20,385 | 107,959 | 162,208 |
| Interest expense, net | 19,878 | 112,462 | 90,982 |
| Real estate taxes, net | 5,671 | 23,353 | 24,778 |
| Depreciation and amortization | 3,897 | 18,544 | 22,011 |
| Goodwill impairments | – | 1,343 | 59,534 |
| Expenses related to debt amendments and early repayment of debt | – | 1,343 | 7,705 |
| (Loss) from continuing operations before reorganization items, minority interests and income taxes | (42,526) | (942,147) | (684,090) |
| Reorganization items, net | 9,502 | 27,792 | – |
| Minority interests | (10) | 14,428 | 8,345 |
| (Loss) from continuing operations before income taxes | (52,038) | (955,511) | (675,745) |
| Income tax benefit from continuing operations | – | (18,715) | (81,235) |
| (Loss) from continuing operations | (52,038) | (936,796) | (594,510) |
| Income from discontinued operations, net of tax | – | – | 1,191 |
| Gain on sale of discontinued operations, net of tax | – | – | 14,788 |
| Net (loss) | $ (52,038) | $ (936,796) | $ (578,531) |

(1)The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

## WCI Communities, Inc.
## Debtor-in-Possession
## Condensed Consolidated Statements of Cash Flows
## (In thousands)

| | Three months ended March 31 | For the years ended December 31, | |
|---|---|---|---|
| | 2009 | 2008(1) | 2007(1) |
| Cash flows from operating activities: | | | |
| Net (loss) | $ (52,038) | $ (936,796) $ | (578,531) |
| Adjustments to reconcile net (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 7,468 | 28,841 | 28,422 |
| Other | 462 | 10,751 | (32,644) |
| Gain on sale of property and equipment | - | - | (22,422) |
| (Earnings) losses from investment in joint ventures | 5 | (514) | (488) |
| Minority interests | 10 | (14,428) | (8,345) |
| Stock-based compensation expense | 375 | 2,059 | 6,624 |
| Asset impairment losses and land acquisition termination costs | 88 | 659,466 | 412,186 |
| Changes in assets and liabilities: | | | |
| Restricted cash | (572) | 8,102 | 21,675 |
| Contracts receivable | - | 358,327 | 911,222 |
| Real estate inventories | 49,785 | 196,514 | (210,113) |
| Distributions of earnings from joint ventures | 163 | 1,388 | 1,043 |
| Other assets | 715 | 62,197 | (36,468) |
| Accounts payable and other liabilities | 8,591 | (24,111) | (121,232) |
| Customer deposits | 74 | (131,236) | (173,949) |
| Income taxes payable | - | 33,295 | 906 |
| Net cash provided by operating activities | 15,126 | 253,855 | 197,886 |
| | | | |
| Cash flows from investing activities: | - | | |
| Additions to property and equipment, net | (579) | (2,536) | (24,481) |
| Proceeds from sale of property and equipment | - | - | 55,160 |
| Contributions to joint ventures | - | (141) | (134) |
| Distributions of capital from joint ventures | - | - | 510 |
| | | | |
| Net cash (used in) provided by investing activities | (579) | (2,677) | 31,055 |
| | | | |
| Cash flows from financing activities: | - | | |
| Net (repayments) borrowings on senior secured revolving credit facility | - | (47,051) | 42,129 |
| Repayment on senior secured term note | - | (37,671) | (37,500) |
| Proceeds from debtor-in-possession term note | - | 80,000 | - |
| Repayment on debtor-in-possession term note | (4,163) | (2,919) | - |
| Proceeds from borrowings on mortgages and notes payable | - | 32,378 | 526,327 |
| Repayment of mortgages and notes payable | - | (330,742) | (590,490) |
| Debt amendment and/or issue costs | (100) | (15,513) | (16,379) |
| Payments to community development districts | 425 | (2,008) | (6,161) |
| Distributions to minority interests | - | (3,263) | (1,728) |
| Proceeds from exercise of stock options | - | - | 1,806 |
| Net cash (used in) financing activities | (3,838) | (326,789) | (81,996) |
| | | | |
| Net (decrease) increase in cash and cash equivalents | 10,709 | (75,611) | 146,945 |
| | | | |
| Cash and cash equivalents at beginning of period | 113,210 | 188,821 | 41,876 |
| | | | |
| Cash and cash equivalents at end of year | $ 123,919 | $ 113,210 $ | 188,821 |

(1)The financial data for the periods ended December 31, 2008 and 2007 have been derived from the Company's audited consolidated financial statements appearing in the Company's Annual Report on Form 10-K for the year ended December 31, 2008.

## VIII.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS

### A.    Purpose and Objectives.

The value of the securities to be issued pursuant to the Plan and the estimated recoveries by holders of Allowed Claims who receive such securities depend in part upon the ability of the Debtors to achieve the financial results projected on the basis of their assumptions.

In order to maximize creditor recoveries, the Debtors must seek to maximize the value of their businesses. Additionally, for the Plan to meet the feasibility test of section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must conclude that confirmation of the Plan is not reasonably likely to lead to the liquidation or further reorganization of the Debtors.

With these considerations in mind, the Debtors formulated their projections and assumptions, which in turn served as the basis for the Plan. The Debtors believe that the assumptions that serve as the basis for the projections are reasonable under the circumstances and that achieving the projections set forth in the Disclosure Statement will maximize the value of the Debtors' businesses.

### B.    Projected Consolidated Financial Statements.

The Debtors have prepared the projected operating and financial results (the "Projections") for WCI and its subsidiaries, on a consolidated basis, through the period ending December 31, 2013 (the "Projections Period"). The Projections are attached to this Disclosure Statement as Exhibit "D."

The Projections should be read in conjunction with the assumptions, qualifications, and the footnotes to the tables containing the Projections as well as the "Risk Factors" section of this Disclosure Statement.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT MAY BE CONSIDERED "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY

MANAGEMENT, MAY NOT BE REALIZED OR MAY BE UNDERSTATED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE ASSUMPTIONS AND RESULTANT PROJECTIONS OR THE ABILITY OF THE DEBTORS AND NEW WCI TO ACHIEVE THE PROJECTED RESULTS FOLLOWING THE EFFECTIVE DATE. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY DEBTOR, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. HOWEVER, FROM TIME TO TIME, THE DEBTORS MAY PREPARE UPDATED PROJECTIONS IN CONNECTION WITH PURSUING FINANCING (INCLUDING THE EXIT FINANCING), CREDIT RATINGS AND OTHER PURPOSES. SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.

## IX.

## VALUATION

The Debtors' financial advisor, Lazard Freres & Co. LLC ("Lazard"), has estimated the value of the Company based on information available as of the date of this Disclosure Statement. The valuation analysis is attached to this Disclosure Statement as Exhibit "E."

Lazard has undertaken the valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Company's operations based on the Projections through the Projection Period, which Projections are attached hereto as Exhibit "D." The Projections provide that the Company will generate cash flow through the sale of existing spec inventory and asset sales throughout the Projection Period; the Company will retain the option to recommence certain operations such as land acquisition, new land development and/or homebuilding activities on a going concern basis during or after the Projection Period. The valuation analysis assumes that the Effective Date of the Plan occurs on September 30, 2009 (the "Assumed Effective Date").

THE VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

## X.

## THE REORGANIZATION CASES

### A.    Commencement of the Chapter 11 Cases.

On August 4, 2008, WCI and 126 of its direct and indirect subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Kevin J. Carey presiding.

### B.    Procedural Orders.

#### 1.    Joint Administration.

In order to expedite the administration of the Chapter 11 Cases and reduce administrative expenses, the Debtors sought the joint administration of the Chapter 11 Cases. The Bankruptcy Court issued an order directing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes.

#### 2.    Interim Compensation and Reimbursement of Professional Persons and Committee Members.

In an effort to enable all parties to monitor the costs of administration, enable the maintenance of a more level cash flow availability and implement efficient cash management, the Debtors developed procedures for interim compensation and reimbursement of expenses of the Professional Persons and Creditors' Committee members. On August 25, 2008, the Bankruptcy Court issued an order establishing certain procedures with which all Professional Persons would be required to comply in seeking payment of compensation and reimbursement of

31

expenses. In addition, a procedure for reimbursement of expenses incurred by members of the Creditors' Committee was established.

At the request of the Bankruptcy Court, by order dated February 18, 2009, Warren H. Smith & Associates, P.C. was appointed as fee auditor to act as special consultant to the Bankruptcy Court for professional fee and expense review and analysis.

## C.   Continuation of Business After the Petition Date.

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as Debtors in Possession. The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses. As discussed in this section, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 administration and the stabilization of their operations.

### 1.   Cash Collateral.

As described above, as of the Petition Date, the Debtors had granted the Prepetition Lenders security interests in substantially all of the Debtors' Assets, including all cash (the "Cash Collateral"). Given the purported encumbrances upon substantially all of the Debtors' Assets under the Prepetition Credit Facilities, the Debtors would have been unable to continue their business operations absent some form of immediate relief from the Bankruptcy Court. Simply put, approval of the use of the Debtors' Assets that were or may have become Cash Collateral was required to fund the Debtors' day-to-day operations and preserve the value of the Debtors' Assets as a going concern.

On August 5, 2008, pursuant to an agreed form of order between the Debtors and the Prepetition Lenders, the Bankruptcy Court authorized the Debtors' immediate use of Cash Collateral on an emergency and interim basis, subject to certain limitations such as a set Cash Collateral budget. The Bankruptcy Court further found that the Prepetition Lenders' interests were adequately protected based upon (a) periodic cash payments of current interest at the non-default rate under the respective Prepetition Credit Facilities, (b) the Debtors' continuing to provide the Prepetition Lenders with financial and other reporting, (c) replacement liens on and security interests in all of the Debtors' Assets, whether existing on the Petition Date or acquired or arising thereafter, equal to the aggregate net diminution in the value of the Prepetition Lenders' interest in their collateral, and (d) granting the Prepetition Lenders superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which are, with limited exception, senior to all other administrative claims.

On August 27, 2008, the Bankruptcy Court entered a second consensual form of order between the Debtors and the Prepetition Lenders extending the period of time during which the Debtors could access the Cash Collateral pursuant to an additional fixed Cash Collateral budget.

On September 23, 2008, the Bankruptcy Court entered a final order (a) authorizing the Debtors' use of cash, including Cash Collateral, on a final basis subject to certain limitations (b) providing adequate protection to the Prepetition Lenders, and (c), among other things,

authorizing the Debtors to enter into a postpetition debtor-in-possession financing arrangement, as discussed below. Among other things, the Bankruptcy Court granted the Prepetition Lenders various forms of protection, including replacement liens and superpriority administrative claims to protect against any diminution of the Cash Collateral during the Chapter 11 Cases.

### 2.    Debtor-in-Possession Financing.

On September 23, 2008, the Bankruptcy Court entered an order (the "DIP Order") authorizing the Debtors to enter into a $150,000,000 Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") with a syndicate of lenders (the "DIP Lenders"), some of which were Prepetition Lenders, led by Wachovia Bank, National Association, acting as administrative agent, and Bank of America, N.A. acting as collateral agent. The DIP Credit Agreement includes an $80,000,000 term loan and a $70,000,000 revolving credit facility (collectively, the "DIP Loans"). The $80,000,000 term loan was a required borrowing on the closing date. Approximately $50,000,000 of this term loan was used to repay the outstanding balance under the Debtors' Tower Facility, and the remainder of the proceeds of the loan are being used for general corporate purposes. Availability of funds under the $70,000,000 revolving credit facility is subject to a limitation on the amount of cash and cash equivalents held by the Debtors. Pursuant to the DIP Credit Agreement, the Debtors may also request the issuance of up to $25,000,000 in letters of credit.

WCI is the borrower under the DIP Credit Agreement, and all of the other Debtors have absolutely, unconditionally, and irrevocably guaranteed WCI's obligations under the DIP Credit Agreement. The DIP Credit Agreement and the related guarantees are secured in accordance with sections 364(c) and (d) of the Bankruptcy Code by superpriority liens on, and security interests in, substantially all of the Debtors' assets. These superpriority liens are senior in priority to the security interests and liens of the Prepetition Lenders. In return for expressly consenting to such a "priming" lien, the Debtors granted the Prepetition Lenders various forms of protection, including replacement liens and superpriority administrative claims to protect against the diminution of the collateral value to the extent provided in the DIP Order. The DIP Credit Agreement initially matures on September 24, 2009, subject to a six-month extension period.

The DIP Credit Agreement includes certain covenants that impose substantial restrictions on the Debtors' financial and business operations, including the ability to, among other things, incur or secure other debt, make investments, sell assets and pay dividends or repurchase stock. Further, the Debtors are required to make certain mandatory repayments under the DIP Credit Agreement in the event the Debtors sell certain assets, including bulk unit sales, subject to certain exceptions. In addition, the Debtors are required to meet certain monthly cash flow variance tests. To date, the Debtors are in compliance with these covenants.

The DIP Credit Agreement provided needed liquidity to the Debtors to ensure the efficient operations and future growth of the Debtors' businesses and promote a successful reorganization of the Debtors. Among other things, the DIP Credit Agreement allowed the Debtors to (a) maintain business relationships with vendors, suppliers, and customers, (b) make payroll, (c) make capital expenditures, (d) repay the debt under the Tower Facility, and (e) satisfy other working capital and operational needs.

In early July 2009, the Debtors repaid the then outstanding balance due under the DIP Loans in the amount of $34,098,429.39. The Debtors have retained the ability to utilize, if needed, the revolving credit facility under the DIP Credit Agreement.

## 3.    Business Operations.

### a.    *Cash Management*

As described in greater detail above, as is typical with most corporate enterprises, as of the Petition Date the Debtors had in place a cash management system for the collection of receipts and the disbursement of funds. On August 6, 2008, the Bankruptcy Court authorized the Debtors to continue to use their existing cash management system, bank accounts, and business forms; and continue postpetition their system of intercompany transfers, with limited exception. In particular, the Bankruptcy Court authorized the Debtors to continue to provide funds to certain non-debtor subsidiaries and affiliates in the ordinary course of their businesses in the form of intercompany loans. The Bankruptcy Court also granted the Debtors a limited waiver of certain investment and deposit requirements imposed by section 345 of the Bankruptcy Code.

### b.    *Maintenance of Utility Services*

Prior to the Petition Date, in connection with the operation of their businesses and management of their properties, the Debtors obtained a wide range of utility services (collectively, the "Utility Services") from certain utility companies (the "Utility Companies"), including electricity, telephone and similar service suppliers for which no alternate service could be expected. It was essential that the Utility Services continued uninterrupted after the Petition Date. As such, upon motion of the Debtors, the Bankruptcy Court issued an interim order on August 6, 2008, and then a final order on August 27, 2008, (i) prohibiting the Utility Companies from altering, refusing or discontinuing service to the Debtors, (ii) deeming the Utility Companies adequately assured of future payment, with limited exception, and (iii) establishing procedures for determining requests for additional adequate assurances of payment.

### c.    *Maintenance of Warranty Practices*

Prior to the Petition Date and in the ordinary course of their businesses, the Debtors provided their homebuyers with limited warranties to repair defects in construction and workmanship (the "Home Warranty Programs"). The scope of the warranty offered depended upon the type and location of the home purchased, but generally provided that the Debtors, or in some cases a third party, would repair material defects in workmanship or materials for a limited time. The Debtors also provided homebuyers with the benefits of limited warranties provided to them by manufacturers and certain subcontractors. On August 5, 2008, the Bankruptcy Court authorized the Debtors, in the ordinary course of business, to (i) honor and maintain the Home Warranty Programs and (ii) continue, renew, replace, and implement new or terminate aspects of the Home Warranty Programs consistent with past practices, without further application to the Bankruptcy Court.

#### d.    *Payment of Prepetition Trust Fund Taxes and Governmental Fees*

In the ordinary course of their operations, the Debtors collected sales, use, employee-related withholding and other trust fund type taxes (however denominated) (the "Trust Fund Taxes") from their customers and other parties and remitted such taxes to the appropriate federal, state and local taxing authorities (collectively, the "Taxing Authorities"). On August 6, 2008, the Bankruptcy Court authorized the Debtors to pay prepetition Trust Fund Taxes owed to the Taxing Authorities, in an amount not to exceed $1,000,000, in the ordinary course of business as such payments became due and payable and to the extent adequate funds are available to make such payments.

#### e.    *Insurance and Surety Bonds*

In connection with the daily operation of their businesses, the Debtors maintain certain insurance policies (collectively, the "Insurance Policies") in respect of, among other things, commercial real property, builders' risk, personal property, commercial general liability, boiler and machinery, equipment breakdown, commercial automobile liability, marine and marina operator's legal liability, crime and fiduciary liability, employment practices liability, contractor's pollution liability, terrorism protection, travel accident protection, umbrella/excess liability, marine liability, commercial property, miscellaneous professional errors and omissions liability, and director's and officer's liability. The majority of the Insurance Policies were financed through premium finance agreements. The continuation of the Insurance Policies was crucial given that they provide a comprehensive range of coverage in full force and effect for the Debtors, their businesses and their properties.

In the ordinary course of their businesses, the Debtors are also required to post bonds as collateral to secure certain of their performance, financial and escrow obligations (the "Surety Bonds"). Premiums under each of the Surety Bonds are paid annually. Because the Debtors have a substantial number of Surety Bonds outstanding with various due dates for the annual premium, the Debtors generally make one payment each month, which constitutes various Surety Bonds' annual premium payments. Continuation of the Surety Bonds was necessary because cancellation of the Surety Bonds would constitute a substantial liability and risk of loss of value, as well as a potential breach of many of the Debtors' contracts and other obligations. Without the Surety Bonds, the Debtors would not continue to have the right to conduct business in certain states, would not be entitled to use customer escrow deposits as allowed by applicable law to fund construction costs, and could lose valuable development rights issued by local governmental bodies with respect to ongoing real estate projects or raw land, where the maintenance of Surety Bonds to secure performance of infrastructure construction obligations is a condition to the retaining valuable development rights.

On August 6, 2008, the Bankruptcy Court authorized the Debtors to (i) maintain insurance coverage levels required under their corporate risk program, including authority to revise, extend, supplement, renew or change insurance coverage as needed, (ii) maintain their insurance premium financing program, including authority to renew, supplement or enter new financing arrangements as needed, (iii) maintain Surety Bond programs, including authority to revise, extend, supplement, renew or change Surety Bonds as needed, and (iv) pay any prepetition and postpetition obligations associated therewith. The Bankruptcy Court's order also

35

prevented insurance and surety bond companies from giving notice of termination or otherwise modifying or cancelling any Insurance Policies or Surety Bonds without obtaining further relief from the Bankruptcy Court.[12]

### f.    *Customer Programs*

In the ordinary course of business, the Debtors offered a wide range of customer sales incentives to market their homes and make them more attractive to prospective buyers (collectively, the "Sales Incentive Program"). While the types of incentives offered under the Sales Incentive Program differed widely across the Debtors' operating regions, they generally fell into one of three categories: (i) cash discounts against the purchase price of a Home or Tower Residence, design center upgrades and/or decorator credits; (ii) golf or sports club memberships and marina slips, and/or tangible merchandise such as automobiles and golf carts, provided free or at a reduced price; and (iii) payment of a buyer's closing costs, travel-related expenses and/or certain future expenses for a limited time such as ad valorem taxes or property owner's association assessments. The Sales Incentive Program represented an important aspect of the Debtors' sales and marketing efforts, particularly in promoting communities experiencing weaker demand.

Additionally, in the ordinary course of business, the Debtors offered various coupons, gift cards and certificates (collectively, the "Gift Certificates") that could be redeemed for use at the Debtors' various amenities, including golf, spa and fitness, and dining facilities. Moreover, the Debtors rented out their amenity facilities for weddings, golf tournaments, business meetings, dining and other events. To reserve the amenities for such events, the Debtors' customers were generally required to provide cash deposits (the "Event Deposits"). Further, the Debtors' customers occasionally sought to return merchandise purchased at the Debtors' club and other facilities. In such circumstances, the Debtors would generally refund the cost of the merchandise or allow the customer to exchange for new merchandise of equal or lesser value (the "Merchandise Return Policy").

On August 6, 2008, the Bankruptcy Court entered an order authorizing the Debtors to honor and maintain their Sales Incentive Program, Gift Certificates, Event Deposits, and Merchandise Return Policy in the ordinary course of business.

### g.    *Authority to Issue Title Insurance and to Hold Property in Trust as Closing Agent*

As briefly discussed above, Debtor First Fidelity provides a full range of title insurance and closing services and, in that regard, issues policies on behalf of large national title insurers (the "Title Insurers") and derives its revenues primarily from commissions on title insurance premiums and closing services provided to the Debtors' homebuilding customers and other

---

[12]     With regard to the relief requested preventing insurance and surety bond companies from giving notice of termination or otherwise modifying or cancelling any Insurance Policies or Surety Bonds without obtaining relief from the Bankruptcy Court, the Debtors received objections from two surety bond companies, including Safeco Insurance Company of America, Inc. The dispute is discussed in detail in the "Material Claims and Litigation – Safeco Litigation and Settlement" section of this Disclosure Statement.

customers in connection with residential and commercial closings. The Debtors anticipated that the Chapter 11 Cases might create some apprehension for parties using First Fidelity's title insurance and closing services. To provide comfort to the Debtors' existing and prospective customers and other parties in interest, including the Title Insurers, the Debtors sought, and the Bankruptcy Court entered, an order (i) authorizing First Fidelity to continue to issue title insurance policies in the ordinary course of business as agent for the Title Insurers and to collect and remit applicable premiums and charges in connection therewith, (ii) authorizing First Fidelity to hold in trust property deposited with it as closing agent in connection with the sale of a Home, Tower Residence or other real property, (iii) confirming that such property held in trust is not property of the Debtors' Estates, (iv) authorizing First Fidelity to make disbursements of such property held in trust upon the closing of the sale of a Home, Tower Residence or other real property and (v) approving a form of communication to be provided to parties seeking to use the closing services of First Fidelity.

### h.    *Critical Vendors, Contractors, and Materialmen*

Prior to the Petition Date and in the ordinary course of their businesses, the Debtors relied on, and routinely contracted with, a number of third-party contractors, subcontractors, materialmen, laborers, engineers and other similar suppliers (the "Construction Lien Claimants") as part of their homebuilding and tower operations. Under applicable law, Construction Lien Claimants may be able to assert construction, materialman's, mechanics' or other statutory liens (the "Construction Liens") against the Debtors' property to secure payment of claims arising from the delivery of prepetition goods and services to the Debtors ("Construction Lien Claims"). These Construction Liens, if properly asserted, attach to the particular parcel or unit of the Debtors' real property with respect to which a Construction Lien Claimant has provided goods or services.

In addition, prior to the Petition Date, the Debtors also used common carriers, shippers, and truckers in connection with the transportation of goods to the Debtors' job sites, as well as various third party warehouses to store goods while in transit (collectively, the "Warehousemen Lien Claimants"). State law may grant entities such as warehousemen the right to possessory liens on the goods in their possession to secure payment for their services ("Warehousemen Liens"). Consequently, these warehousemen could argue that they are entitled to secured claims on account of any prepetition invoices (the "Warehousemen Lien Claims").

In the ordinary course of their businesses, the Debtors also rely on certain third party vendors to supply goods, materials and services that the Debtors cannot operate without or cannot replace without incurring exorbitant costs (the "Vendors").

On the Petition Date, the Debtors sought and, on August 6, 2008 the Bankruptcy Court entered, an order (i) establishing procedures for the resolution and payment of prepetition Construction Lien Claims and Warehousemen Lien Claims secured by valid and enforceable liens, as well as procedures for the resolution and payment of prepetition claims of Vendors (the "Claim Payment Procedures"); (ii) authorizing the Debtors to pay Construction Lien Claims and Warehousemen Lien Claims in accordance with the Claim Payment Procedures in an aggregate amount not to exceed $15,300,000, and (iii) authorizing the Debtors to pay claims of Vendors in accordance with the Claim Payment Procedures in an aggregate amount not to exceed

$5,000,000. By an order dated October 20, 2008, the Bankruptcy Court increased the authorized payments to Lien Claimants from $15,300,000 to $20,500,000.

Pursuant to the above orders, through April 30, 2009, the Debtors have paid approximately $12,600,000 in the aggregate to Construction Lien Claimants and Warehousemen Lien Claimants and $220,000 to Vendors in accordance with the Claim Payment Procedures.

### i.   *Homeowner Association, Condominium Association and Membership Club Obligations*

The associations (the "Associations") formed in conjunction with the Debtors' residential home projects (the "Home Projects"), and tower and similar condominium projects (the "Tower Projects" and, together with the Home Projects, the "Projects") are managed pursuant to governing documents (the "Governing Documents") that meet the requirements of applicable local laws and are recorded such that the rights and obligations provided therein apply to all of the units in the Projects.

Pursuant to the respective Governing Documents, upon purchasing a unit in a Project, an owner becomes a member of the Association and is thereafter assessed periodic dues by the Association (the "Association Dues"), to cover various operating expenses. Although the Debtors initially control each Association, control is ultimately transferred to the homeowners (the "Turnover"). For each of the Associations, the Debtors are typically obligated to either (a) fund deficits in the Association's operating budget prior to Turnover ("Deficit Funding") or (b) pay Association Dues for the unsold units that the Debtors' hold in inventory ("Assessment Funding").

The Debtors also incorporate non-profit equity clubs (the "Equity Clubs") that own golf and other club amenities. The Debtors sell club memberships for a lump sum payment and, thereafter, the member owns an interest in the Equity Club and is assessed periodic membership dues. The Debtors generally remain in control of each Equity Club until the earlier of an agreed upon date or the sale of a certain percentage of membership interests in the Equity Club, at which time control is transferred to the members. Prior to a change in control, the Debtors are required to fund any deficits in each Equity Club's budget after accounting for fees paid by the other members (the "Equity Club Funding").

Additionally, certain of the Debtors' housing communities own golf and other club amenities and operate non-equity clubs (the "Non-Equity Clubs"). Members of the Non-Equity Clubs pay periodic dues to the Debtors but do not own an interest in the club or its assets. Thus, the Debtors receive all revenues and fund all of the costs of operating the Non-Equity Clubs. Depending upon the total number of members, the operating expenses of the Non-Equity Clubs may exceed the revenues generated from membership dues and, as a result, the Debtors must fund any shortfall (the "Non-Equity Club Funding"). The Debtors generally pay Non-Equity Club Funding at various times based on the cash requirements of each Non-Equity Club.

On August 6, 2008, the Bankruptcy Court entered an order authorizing the Debtors to pay homeowner association, condominium association and membership club obligations, including

Deficit Funding, Assessment Funding, Equity Club Funding and Non-Equity Club Funding, in the ordinary course of business.

      **j.**      *Authority to Return Homebuyer Deposits*

As of the Petition Date, the Debtors were party to over 255 contracts to design, build and sell Homes and Tower Residences and to sell certain other real property (collectively, the "Contracts"). Under the terms of each of the Contracts, deposits are generally forfeited by a buyer in the event the buyer breaches the agreement. Thus, if a buyer refuses to close on a Contract, in breach of the terms of the Contract, the Debtors are entitled to retain such buyer's deposit as damages for the breach. In some cases, federal or state law permits the Debtors to retain only a portion of the deposit as liquidated damages and the Debtors are required to return the remaining portion to the buyer. Likewise, in the event the Debtors breach or terminate a Contract, the Debtors may be obligated under the Contract to return the entire deposit to the buyer. In addition, in very limited cases, Contracts may be contingent on the buyer being able to obtain the necessary financing to buy the property. Thus, subject to the terms of such Contracts, in the event the buyer is unable to obtain necessary financing, the buyer may be entitled to a return of the deposit from the Debtors.

Realizing that their ability to return deposits where they are obligated to do so under a prepetition Contract is essential to retaining their customer base, the Debtors requested, and on August 6, 2008, the Bankruptcy Court authorized, but did not direct, that the Debtors be able to return deposits subject to and in accordance with the terms of the Debtors' prepetition Contracts.

      **k.**      *Home Sales Order*

On the Petition Date, the Debtors sought and, on August 5, 2008, the Bankruptcy Court entered, an order (the "Home Sales Order") (i) authorizing the Debtors to deliver title to Homes, Tower Residences and other real property free and clear of all liens, claims, encumbrances and other interests in connection with all sales by the Debtors under their prepetition Contracts and postpetition contracts entered into by the Debtors in the ordinary course of business; (ii) authorizing, but not directing, the Debtors to apply deposits at closing on the sale of Homes, Tower Residences, and other real property consistent with their past business practices and in accordance with and subject to the terms and conditions of their relevant contracts; (iii) authorizing, but not directing, the Debtors to pay closing costs in the ordinary course of business; (iv) authorizing, but not directing, the Debtors to modify their contracts to design, build and sell Homes and Tower Residences and to sell other real property if, in the exercise of the Debtors' business judgment, the circumstances warrant; and (v) establishing certain procedures for preserving and resolving claims secured by liens. The Debtors obtained the Home Sales Order to ensure the continuity of their core business and to assure customers, title insurers and other parties of the Debtors' ability to continue uninterrupted sales of Homes, Tower Residences and other real property in the ordinary course of business.

Pursuant to the Home Sales Order, the Debtors have closed on sales of approximately 263 completed units as of April 30, 2009.

### 4.    **Employee-Related Matters**.

Of particular importance to the Debtors' efforts to stabilize their businesses and continue their operations uninterrupted was their ability to maintain the continued support and cooperation of their employees. Accordingly, on the Petition Date, the Debtors sought and, on August 6, 2008, the Bankruptcy Court authorized the Debtors to pay certain prepetition obligations owing to the Debtors' employees, including, but not limited to: (a) amounts owed to employees for wages and salaries; (b) reimbursement of employee business expenses incurred in the ordinary course, such as travel, meals and lodging; (c) maintenance of employee health and welfare plans, workers' compensation, 401(k), and other similar benefits; and (d) other miscellaneous employee expenses and benefits. Furthermore, the Bankruptcy Court authorized and directed each of the banks in which the Debtors maintained a bank account to honor all prepetition and postpetition checks related to such prepetition obligations to employees.

Also, as described below, by orders entered on January 22, 2009 and February 4, 2009, the Bankruptcy Court authorized the Debtors to enter into a key employee incentive plan.

### D.    **Representation of the Debtors**.

In 2008, the Debtors retained White & Case LLP ("White & Case") to provide legal advice with respect to a variety of issues, including restructuring and bankruptcy advice, and preparation of the requisite petitions, pleadings, exhibits, lists and schedules in connection with the commencement of the Chapter 11 Cases. Thomas E Lauria, Craig H. Averch, and Edward E. Sawyer have been acting as lead counsel for the Debtors in the Chapter 11 Cases.

In anticipation of the volume of matters that were likely to come before the Bankruptcy Court in the Chapter 11 Cases, and the special familiarity and experience with the practice and procedure of the District of Delaware, the Debtors also retained Bayard, P.A. ("Bayard") to serve as Delaware bankruptcy co-counsel in connection with the prosecution of the Chapter 11 Cases. Subsequently, the principal attorneys at Bayard working on the Debtors' Chapter 11 Cases joined the law firm of Fox Rothschild LLP ("Fox Rothschild"). As a result, the Debtors have retained Fox Rothschild to serve as Delaware bankruptcy co-counsel in place of Bayard. Jeffrey M. Schlerf has been acting as counsel for the Debtors from Fox Rothschild in the Chapter 11 Cases.

Prior to the Petition Date, the Debtors employed certain professionals, in the ordinary course of business, to render services to their Estates (collectively, the "Ordinary Course Professionals"), including legal services and certain accounting, tax and consulting services, which were necessary to the day-to-day continuation of the Debtors' operations. On August 27, 2008, the Bankruptcy Court granted the Debtors the authority to employ the Ordinary Course Professionals.

In addition to White & Case, Fox Rothschild, and the Ordinary Course Professionals, the Debtors obtained approval from the Bankruptcy Court for the retention of the following Professional Persons: (a) Lazard as the Debtors' financial advisor; (b) FTI Consulting, Inc. ("FTI") as the Debtors' bankruptcy and restructuring advisor; (c) Ernst & Young LLP as the Debtors' auditor and tax advisor; and (d) Sitrick and Company Inc. as the Debtors' communications consultant. Additionally, Epiq Bankruptcy Solutions, LLC ("Epiq") was