**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| **WCI COMMUNITIES, INC.**, *et al.*[1] | : | Case No. 08-11643 (KJC) |
| Debtors. | : | Jointly Administered (Re: D.I. 3663) |

# MEMORANDUM[2]

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

On April 11, 2012, Lesina at Hammock Bay Condominium Association, Inc. (the "Association") filed a Motion, pursuant to 11 U.S.C. §105(a), for: (I) a Determination that the Reorganized Debtors are Unjustified in Threatening Sanctions if Movant Commences a Florida State Court Lawsuit Against the Entities Formerly Known as WCI 2009 Corporation and WCI 2009 Asset Holding, LLC ("New WCI") based on Post-Effective Date Claims; (II) a Determination that New WCI's Obligation to Pay Outstanding Condominium Assessments and

[1] The chapter 11 case filed by WCI Communities, Inc. ("Old WCI") is jointly administered with over 100 related debtors pursuant to the Order dated August 5, 2008 (D.I. 54).

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). Bankruptcy Courts have subject matter jurisdiction to interpret and enforce their own orders. *In re Insilco Tech., Inc.*, 351 B.R. 313, 319 (Bankr.D.Del. 2006) citing *In re Allegheny Health, Education and Research Foundation,*, 383 F.3d 169, 175-76 (3d Cir. 2004). Moreover, this is a core matter pursuant to 28 U.S.C. §157(b)(1) and *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999), which provides that a matter is core if it is one that, by its nature, could arise only in the context of a bankruptcy case. This matter also falls squarely within the confines of post-confirmation "related-to" jurisdiction set forth in *In re Resorts Int'l, Inc.,* 372 F.3d 154, 166-67 (3d Cir. 2004) which determined that the essential inquiry for post-confirmation jurisdiction is "whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction . . . . Matters that affect the interpretation, implementation, consummation, execution or administration of the confirmed plan will typically have the requisite close nexus."

Deficit Funding as Determined by a Post-Turnover Audit is Not Impeded by the Debtors' Plan; and (III) Any Related Relief as to the Debtors (D.I. 3663; the "Motion"). The Association intends to pursue claims against New WCI in Florida state court with respect to (A) Florida statutory warranties for construction defects in the common areas of the Lesina Condominium, and (B) payment of the shortfall due for the common area expenses during the developer's "guarantee period," as determined by a post-turnover audit.[3] New WCI has threatened to seek sanctions against the Association if it pursues a state court action, on the grounds that the Debtors' confirmed Plan and Confirmation Order bar pursuit of the Association's causes of action. The Association filed the Motion in response to these threats by New WCI.

New WCI filed an objection to the Motion on April 30, 2012 (D.I. 3670) (the "Objection"). The Association filed a reply in further support of the Motion on May 3, 2012 (D.I. 3672) (the "Reply"). A hearing on the Motion was held before this Court on May 8, 2012 (D.I. 3678) (the "Hearing"). Thereafter, the parties participated in mediation, which was not successful.

On May 18, 2012, the Third Circuit issued its decision in *Wright v. Corning*, 679 F.3d 101 (3d Cir. 2012). Because *Wright v. Corning* discusses the application of *JELD-WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010) (en banc) and *Avellino v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332 (3d Cir. 1984), two cases that were discussed in the parties' earlier briefing, the Court requested supplemental briefing on the effect of *Wright v. Owens Corning* on the relief requested in the Motion. *See* Order dated November 20, 2012 (D.I. 3722). The parties submitted supplemental briefs on December 28, 2012 (D.I. 3737 [New WCI], D.I. 3738 [the Association]). Replies were filed on January 11,

[3] Old WCI was the original developer of the Lesina at Hammock Bay Condominium in Naples, Florida, a luxury residential condominium consisting of 116 units (the "Lesina Condominium").

2013 (D.I. 3741 [New WCI]; D.I. 3742 [the Association]). For the reasons given below, I conclude that the causes of action contemplated by the Association are not barred by the Plan's discharge, injunction or release provisions.

## BACKGROUND

### A. The Bankruptcy Case

1. The Debtors

On August 4, 2008, 2009 Real Estate LLC f/k/a 2009 Real Estate Corporation f/k/a WCI Communities[4] and 126 of its direct and indirect subsidiaries (the "Original Debtors") filed voluntary petitions in this Court for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*). The Original Debtors constructed homes and operated residential leisure-oriented communities.

On December 2, 2008, the Court entered an Order establishing the bar date for filing claims against the estate as February 2, 2009. (D.I. 799). On February 2, 2009, the Association (while still under the control of Old WCI) filed proof of claim no. 3341 for an unliquidated amount. (*See* Exhibit 12 to Motion).

As part of its restructuring plan, the Original Debtors formed three new subsidiaries of Old WCI: WCI 2009 Corporation, WCI 2009 Asset Holding, LLC, and WCI 2009 Management, LLC (the "2009 Entities"). On July 1, 2009, the 2009 Entities each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Schedules filed by the 2009 Entities reflect that each had no creditors, accounts, employees, books, or records. This Court granted a request

[4] WCI Communities, Inc. changed its name to 2009 Real Estate Corporation after its plan of reorganization was confirmed, and then converted to a limited liability company, 2009 Real Estate LLC.

for joint administration of the 2009 Entities' chapter 11 cases with those of the Original Debtors on July 17, 2009. (D.I. 2099).[5]

2. The Plan of Reorganization

On July 17, 2009, the Debtors filed the Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. and its Affiliated Debtors (D.I. 2088) (the "Plan") and a corresponding Disclosure Statement (D.I. 2089). The Plan provides that most of Old WCI's subsidiaries would transfer substantially all of their assets to Old WCI before the Effective Date, and that Old WCI would then transfer substantially all of its assets to WCI 2009 Asset Holding, LLC, a direct subsidiary of WCI 2009 Corporation. (Plan, §8.2). WCI 2009 Asset Holding, LLC would then change its name to WCI Communities, LLC, and WCI 2009 Corporation would change its name to WCI Communities, Inc. and become the Disbursing Agent under the Plan. (Plan, §8.1(f), §8.10). The Plan also contains broad discharge and release provisions. Section 8.2 of the Plan includes a provision at the end of the section that states as follows:

> EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEITHER NEW WCI NOR ANY NEW WCI GUARANTOR SHALL HAVE OR BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY, CLAIM, OR OBLIGATION ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO WCI) AND NO SUCH LIABILITY, CLAIM, OR OBLIGATION FOR ANY ACTS SHALL ATTACH TO NEW WCI OR THE NEW WCI GUARANTORS.

(Plan, § 8.2) (emphasis in original). The Plan was confirmed on August 26, 2009 and went into effect on September 3, 2009 (the "Effective Date"). (Confirmation Order, D.I. 2363; Notice of Effective Date, D.I. 2421).

[5] The Original Debtors and the 2009 Entities are collectively referred to as the "Debtors."

i. *The Discharge & Injunction*

The Plan and the Confirmation Order provide for a general discharge of all Claims against the Debtors as well as a permanent injunction against all Persons who have been, are, or may be holders of Claims against the Debtors. Paragraph 63 of the Confirmation Order, entitled "Effect of Confirmation," provides, in part, that on the Effective Date, "all Claims against . . . the Debtors and the Debtors-in-Possession shall be satisfied, discharged and released in full." (Confirmation Order, ¶ 63). The Injunction in §18.23 of the Plan provides, in part:

> On the Effective Date and <u>except</u> as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against . . . the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the New WCI Group or its Affiliates, the Debtors or their Affiliates, the Estates, the Assets, or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, successors and assigns or their respective assets and property with respect to such Claims . . . (other than actions brought to enforce any rights or obligations under the Plan):
>
> > (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (<u>including</u>, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice) . . . .

(Plan, § 18.23 (emphasis in original). *See also* Confirmation Order, ¶ 69 (containing a nearly identical injunction)).

ii. *The Releases*

The Plan and Confirmation Order also contain broad releases, from which voting creditors could exempt themselves by filing a written election to opt-out. Section 8.15 of the Plan provides:

> Subject to the occurrence of the Effective Date, any holder of a Claim that is impaired or unimpaired under the Plan . . . will be presumed conclusively to have released the Debtors, the New WCI Group, their non-Debtor affiliates and each of their respective present and former officers and directors . . . from any Cause of Action based on the same subject matter as such Claim . . . <u>except, further</u>, that the foregoing releases shall not

> apply to any holder of a Claim . . . if such holder "opts-out" of the releases provided in this Section by a timely written election.

(Plan, § 8.15). The Confirmation Order provides that "[t] he releases set forth in Sections 8.14 and 8.15 of the Plan are incorporated herein by reference and shall be, and hereby are, approved, and shall be effective without further action upon the occurrence of the Effective Date." (Confirmation Order, ¶ 58). The Association (controlled by Old WCI at the time Plan voting took place) did not file a written election to opt out. A ballot for the Association was mailed to debtor WCI Communities for voting, but Old WCI did not return a ballot for the Association. (Affidavit of Service, D.I. 2314; Report on Plan Voting, D.I. 2318).

**B. Lesina at Hammock Bay**

1. Construction and Management

Prior to the Petition Date, Old WCI built and developed the Lesina Condominium.[6] On March 8, 2007, Old WCI recorded the Declaration of Lesina at Hammock Bay, a Condominium (the "Condominium Declaration"). The Condominium Declaration, together with the Articles of Incorporation of Lesina at Hammock Bay Condominium Association, Inc. (the "Articles of Incorporation")[7], and the By-Laws of Lesina at Hammock Bay Condominium Association, Inc. (the "By-Laws") incorporated the Association as a separate and independent non-profit organization to administer and manage the Lesina Condominium.

The Articles of Incorporation provide that the Association is to be managed initially by a three-member board of directors, appointed by Old WCI, until the event known as "Turnover" occurred. At Turnover, control of the board of directors would pass to the condominium owners, through election of a five-member board. (Articles of Incorporation, § VIII). Pursuant to Florida

[6] New WCI contends that a Certificate of Occupancy for the Lesina Condominium was issued on July 17, 2007, following the completion of construction.

[7] The Articles of Incorporation were filed with the Florida Secretary of State on January 22, 2007. *See* Exhibit 2E to Motion.

law and the Articles of Incorporation, Turnover occurs either "(a) [t]hree years after 50 percent of the units that will be operated ultimately by the association have been conveyed to purchasers; [or] (b) [t]hree months after 90 percent of the units that will be operated ultimately by the association have been conveyed to purchasers." (Fla. Stat. Ann. § 718.301(1); Articles of Incorporation, § VIII). The Turnover of the Association by election of new board members occurred on December 4, 2009, *after* confirmation of the Plan.[8]

2. Turnover & Post-Turnover Audits

Pursuant to the Condominium Declaration, the Developer is excused from paying its share of common expenses and assessments attributable to unsold units until the earlier of (i) the last day of the twelfth full calendar month following the recording of the Condominium Declaration, and (ii) the date of Turnover (the "Guarantee Period"). (*See* Exhibit 2 to Motion (Condominium Declaration), ¶ 13.11); *see also* Fla. Stat. Ann. § 718.116(9)(a)(2). During the Guarantee Period, the Developer is responsible for paying common expenses actually incurred for the condominium that exceed the assessments collected from other unit owners. *Id.* Old WCI terminated the Guarantee Period on December 31, 2008 and began paying assessments attributable to the unsold units on January 1, 2009. Old WCI continued to pay these assessments until Turnover occurred on December 4, 2009.

At Turnover, Florida law requires the developer to obtain an audit of the association's financial records. Fla. Stat. Ann. § 718.301(4)(c).[9] An independent auditor, Tony L. Gregory, CPA, P.A., ("Gregory") completed an audit of the Association's financial records, and issued a report dated February 2, 2010, in which he concluded that the Association was owed $69,745 in

[8] As discussed, *supra.*, the Plan was confirmed on August 26, 2009, and the Effective Date of the Plan was September 3, 2009.

[9] Section 718.301(4)(c) provides, in relevant part, that at the time of turnover, the developer shall cause the association's financial records to "be audited for the period from incorporation of the association" to the date of turnover. Fla. Stat. Ann. § 718.301(4)(c).

deficit guarantee payments. (*See* Exhibit 3 to Motion (the "Gregory Audit")). A subsequent audit completed by Gerstle, Rosen & Goldenberg, P.A. ("GRG") on August 18, 2010 shows that the Association was owed $84,151. (*See* Exhibit 7 to Motion, p. 9 (the "GRG Audit")).

Additionally, Fla. Stat. Ann. § 718.301(7) sets forth predicates which must be met before an association may pursue a claim against a developer for construction defects.[10] The Association hired engineering firms to assess construction defects at Lesina Condominium. (*See* WCI Objection (D.I. 3670), Exhibit E, Notice of Claim, describing construction defects and attaching reports from Forge Engineering Inc. and Karins Engineering Group, Inc.). The Association sent WCI a notice pursuant to Section 558 *et seq*. of the Florida Statutes, listing the construction defect claims on June 10, 2010. *Id.*; Fla. Stat. Ann. § 718.301(7). The Association estimates that the cost of repairs is approximately $500,000. (Oral Argument Tr. 9:12-13 (D.I. 3678)).

## DISCUSSION

The Association seeks to pursue two causes of action against New WCI: the first, based upon statutory warranties for construction defects in common areas of the Lesina Condominium (the "Statutory Warranty Claims"), and the second, based upon deficit funding and accumulated Association fee assessments (the "Assessment Claims"). New WCI contends that the Association's claims are based upon pre-petition conduct and, therefore, barred by the confirmed Plan's discharge, injunction and release provisions. New WCI further argues that the

[10] Fla. Stat. Ann. § 718.301(7) provides that "[i]n any claim against a developer by an association alleging a defect in design, structural elements, construction, or any mechanical, electrical, fire protection, plumbing, or other element that requires a licensed professional for design or installation . . . such defect must be examined and certified by an appropriately licensed Florida engineer, design professional, contractor, or otherwise licensed Florida individual or entity."

Association cannot rely upon state law to create an exception to the Plan or to "revive" a claim that has been discharged, enjoined or released.

In response, the Association argues that its claims were not discharged or released by the Plan because (1) pursuant to Florida law, the claims arose after Turnover, which happened post-confirmation, (2) the claims against New WCI are based upon New WCI's post-confirmation conduct as a developer, which creates liability under applicable Florida law, and (3) the Assessment Claims are not "claims" at all, but covenants that run with the land.[11]

Determination of whether the Plan's discharge, injunction or release provisions bar the causes of action depends upon whether the Association was the "holder of a Claim" pre-confirmation or, more specifically, whether these particular causes of action asserted by the Association existed pre-confirmation.

For years, the Third Circuit's standard for determining when a "claim" arose was found in the *Frenville* decision. *Avellino v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332 (3d Cir. 1984). *Frenville* held that a claim does not ripen until a right to payment arises, as determined by reference to state law. *Id.* at 337. The *Frenville* test is often summarized as deciding that "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose" as determined by reference to relevant non-bankruptcy law. *Kilbarr Corp. v. Gen. Servs. Admin., Office of Supply & Servs. (In re Remington Rand Corp.)*, 836 F.2d 825, 830 (3d Cir. 1988) "State law applies . . . unless federal law 'creates substantive obligations' wholly apart from bankruptcy." *Id.*

However, the Third Circuit abandoned the *Frenville* test in *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010), in which the Court, sitting *en banc*, held

[11] The Association also argued that the Claims are ordinary course of business expenses for New WCI, but the record before me is not developed with respect to New WCI's "ordinary course of business."

that a "claim" arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment." *Id.* at 125. The *Grossman's* Court explained that *Frenville's* focus on the "right to payment" failed to give sufficient weight to other words in the statutory definition that modified the term "claim," *i.e.,* "contingent," "unmatured," and "unliquidated."[12] *Grossman's,* 607 F.3d at 121. "The accrual test in *Frenville* does not account for the fact that a "claim" can exist under the Code before a right to payment exists under state law." *Id. See also In re Rodriguez,* 629 F.3d 136, 139, 142 (3d Cir. 2010) (Deciding that, under the *Grossman's* test, a lender's claim against a debtor-mortgagor for an escrow account deficit arose at the time the debtor failed to make the escrow payment, even if the lender's right to payment was contingent upon the lender's disbursement of its own funds to satisfy an escrow expense.).

A Court of Appeals panel revisited the *Grossman's* test in *Wright v. Owens Corning,* 679 F.3d 101 (3d Cir. 2012). The *Wright* Court expanded the test announced in *Grossman's* by holding that "a claim arises when an individual is exposed *pre-confirmation* to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code." *Wright*, 679 F.3d at 107 (emphasis in original). To assuage due process concerns, the *Wright* Court also decided that the *Frenville* test should continue to apply to two groups of claimants:

(1) persons who hold claims based upon exposure to a debtor's conduct or product *pre-petition,* if the reorganization plan was proposed and confirmed prior to the date *Grossman's* was decided (June 2, 2010), and

[12] The Bankruptcy Code defines the term "claim" in 11 U.S.C. §101(5) as: (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(2) persons who hold claims based upon exposure to a debtor's conduct or product *post-petition,* but *pre-confirmation,* if the reorganization plan was proposed and confirmed prior to the date *Wright* was decided (May 18, 2012).

*Wright* at 109.

Here, the Debtors' Plan was confirmed in August 2009, prior to the *Grossman's* and *Wright* decisions. Therefore, *Wright* instructs that *Frenville* governs the matter at hand. *Id.* To determine when the Association's claims arose, we consider when a "right to payment" arose under Florida state law. *See Frenville*,744 F.2d at 337.

The Association asserts both the Statutory Warranty Claims and the Assessment Claims under the Florida Condominium Act. Fla. Stat. Ann. § 718.101, *et seq*. (the "Condominium Act"). The Condominium Act provides, in pertinent part, that:

> After control of the association is obtained by unit owners other than the developer, the association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all unit owners concerning matters of common interest to most or all unit owners . . . .

Fla. Stat. Ann. § 718.111(3). As a practical matter, the Association cannot exercise its right to maintain an action on behalf of the unit owners until Turnover occurs. The Condominium Act provides that the statute of limitations for any claims to be brought by the Association begins to run at Turnover. Fla. Stat. Ann. § 718.124 ("The statute of limitations for any actions in law or equity which a condominium association or a cooperative association may have shall not begin to run until the unit owners have elected a majority of the members of the board of administration."). In discussing the tolling provision, Florida courts have noted:

> [T]he obvious purpose of § 718.124 was to lengthen the limitations period for particular causes of action. Section 718.124 was intended to prevent a developer from retaining control over an association long enough to bar a potential cause of action which the unit owners might otherwise have been able and willing to

> pursue. To this end, the statute provides that an association's cause of action does not accrue until the unit owners have acquired control over the association.

*Charley Toppino & Sons, Inc. v. Seawatch at Marathon Condominium Ass'n, Inc.,* 658 So.2d 922, 925 (Fla. 1994) quoting *Regency Wood Condominium, Inc. v. Bessent, Hammock & Ruckman, Inc.*, 405 So.2d 440, 443 (Fla. App. 1st Dist. 1981). Similar concerns arise when a developer retains control over an association during a bankruptcy, as in this case, in which Old WCI (on behalf of the Association) filed a proof of claim in an contingent and unliquidated amount.

The Condominium Act also establishes certain post-turnover procedures an association should follow before a pursuing a claim. The Condominium Act requires a post-turnover audit of the association's financial records "to determine if expenditures were for association purposes . . . [and] to determine that the developer was charged and paid the proper amounts of assessments." Fla.Stat. §718.301(4)( c). Moreover, the Condominium Act requires an association to obtain certification "by an appropriately licensed Florida engineer, design professional, contractor or otherwise licensed individual or entity" prior to bringing a claim for construction or design defects. Fla. Stat. §718.301(7).

I conclude that, under the *Frenville* test and an analysis of the applicable Florida Condominium Law, the Association's right to payment for the Statutory Warranty Claims and the Assessment Claims did not arise until Turnover, which occurred post-confirmation. Based on the particular timing and circumstances before me, the Association was not the holder of a claim prior to the Effective Date and, accordingly, the Injunction of section 18.23 of the Plan and the Releases in section 8.15 of the Plan do not bar to the Association's asserted claims. Moreover, the Association's claims were not "in

existence on or prior to the effective date of the plan" and the discharge provision of section 8.2 of the Plan also does not bar the Association's claims.

Furthermore, the Association contends that it seeks to pursue its claims against New WCI based on New WCI's liability as a "developer" under the Condominium Act, which provides, in pertinent part, that:

> The developer shall be deemed to have granted to the purchaser of each unit an implied warranty of fitness and merchantability for the purposes or uses intended as follows:
> . . . .
> (e) As to the roof and structural components of a building or other improvements and as to mechanical, electrical, and plumbing elements serving improvements or a building, except mechanical elements serving only one unit, a warranty for a period beginning with the completion of construction of each building or improvement and continuing for 3 years thereafter or 1 year after owners other than the developer obtain control of the association, whichever occurs last, but in no event more than 5 years

Fla. Stat. Ann. § 718.203. Further, the statute requires a *developer* to obtain an audit of the association's financial records at turnover. Fla. Stat. Ann. §718.301(4)(c ). The Condominium Act defines "developer" as "a person who creates a condominium *or offers condominium parcels for sale or lease in the ordinary course of business…."* Fla. Stat. Ann. § 718.103(16) (emphasis added).

After the Effective Date and pursuant to the Plan, New WCI obtained title to the 24 yet-unsold units of the Lesina Condominium. (*See* Exhibit 4 to Motion (Quit-Claim Deed dated September 3, 2009)). The Association contends that New WCI subsequently marketed and sold 19 of those 24 units in the ordinary course of business within the following year. The Association argues that this conduct qualifies New WCI as a "developer" under the Condominium Act. *See Friebel v. Paradise Shores of Bay County, LLC*, 2011 WL 500001 at *5 (N.D. Fla. Feb. 7, 2011) (explaining that a defendant was a "developer" within the Condominium

Act's definition because it "created the prospectus which was a sales advertisement inviting prospective buyers to 'come join us in paradise'") (internal citation omitted).

I agree that the Association's claims are based upon assertions related to New WCI's post-confirmation conduct.[13] The claims are not based upon successor liability to Old WCI and are not pre-petition claims "revived" by state law, but are claims that came into existence post-confirmation. For this additional reason, I conclude that the Plan does not bar the Statutory Warranty Claims and the Assessment Claims.

Finally, the Association argues that the Assessment Claims are property interests, rather than dischargeable claims, because Florida state law provides that a homeowner association's assessments are covenants that run with the land. A Florida court, deciding that a debtor's obligation for postpetition homeowner association assessments would survive a chapter 7 discharge, described the issue as follows:

> A covenant running with the land, including any express provision for the debtor to be personally obligated to pay the homeowners' association, is an integral part of the property which the debtor acquired when the debtor acquired title to the property. . . . The debtor's acceptance of a deed and the corresponding recorded covenants, however, is one single and inseparable transaction. Therefore, to release the debtor from a recorded covenant is to take a property interest away from the homeowners' association and give the debtor a property interest which the debtor never had in the first place. Any release from a covenant would in effect be a forced conveyance of a property interest from the homeowner's association to the debtor, something clearly beyond the scope of the Chapter 7 discharge.

*In re Rivera*, 256 B.R. 828, 833-34 (Bankr. M.D. Fla. 2000). The Association is not barred from asking the court in which the Association brings its claims to determine whether New WCI's post-confirmation obligations as a developer for the Assessment Claims are a property interest under Florida state law.

---

[13] Whether New WCI's conduct falls within the statutory definition of a "developer" is for determination by the court in which the Association brings its claims.

**CONCLUSION**

For the reasons set forth above, I conclude that the Plan's discharge, injunction and release provisions do not bar the Association from pursuing its Statutory Warranty Claims and Assessment Claims against New WCI. An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: May 17, 2013